Mr. Justice CLIFFORD.
These are appeals from a decree of the District Court of the United States for the Northern District of California, brought here under the Act of Congress of the 3d of March, 1851, entitled “ an Act to ascertain and settle the private land claims ” in that State.
*145 Provision was made by the first section of that act for the appointment of Commissioners to examine all such claims, and decide upon their validity; and it was provided by the 8th section of the act, that every person claiming land in that State by virtue of any right or title derived from'.the Spanish or Mexican Governments, should present the same to those Commissioners for their adjudication.
Pursuant to that requirement, Andres Castillero, on the 30th day of September, 1852, presented the claim in controversy for adjudication to the Board of Commissioners constituted under that act, and at the same time submitted certain documentary evidences of title, to show that the claim ought to be confirmed. Among other things, he represented in his petition to the effect, that, in the year 1845, he discovered a mine of cinnabar in the then jurisdiction of San José, which is now known as the County of Santa Clara, in the State of California; and that having formed a company for working the miné, he, on the 3d day of December of that year, received from the Magistrate of that jurisdiction, in due form, the juridical possession of the mine, and also of certain adjacent land, to the extent of three thousand varas in all directions, averring, in-the same connection, that all the facts so alleged would appear by the duly authenticated papers issued from the office of that Magistrate, copies, of which were submitted with the petition. He also represented, that soon after his discovery, the record of his mining possession, or a testimonio of the same, was submitted to the Junta de Fomento y Administrativa de Minería, the highest mining tribunal of Mexico; and that the members of that tribunal, on the 14th day of May, 1846, after an examination of the laws relative thereto, and mature deliberation, declared that the juridical possession so given, although embracing an unusually large extent of land, was in conformity to law, and fully justified by the circumstances of the case, and recommended to the Presi dent through the Minister of Justice, not only that his mining ■ possession should be confirmed, but that two square leagues oi land should also be granted to him' in fee for the benefit of his mining operations. Petitioner accordingly claimed the two *146 leagues of land in fee as well as the mining possession, and in support of the claim to the land, he alleged that the Minister oí Justice, on the 20th day of the same month, informed the Junta is Fomento that the President had acceded to the reeommenda tipn and granted the land; that on the same day he also notified the Minister of Relations of the same, fact, in order that the proper decree might be issued; and that the Minister of Relations, on the 23d day of May, 1846, issued his order to .the Governor of the Department, directing him to put the petitioner in the possession of the same two square leagues of land. Referring to the last dispatch, and assuming it to be a grant, he also alleged in his petition, that on receiving the same, he started to go to that Department'for the purpose of surveying the land and taking juridical possession of the same, but was interrupted in . his journey-and prevented from so doing by the operations of the war between the two countries.
Such is the substance of the representations of the petition so far as respects the title of the claimant, but he also alleged that he had ever since continued in possession both of the mine and the land, and that he and those claiming under him had made extensive and expensive improvements on the premises. Claimant presented certain documentary evidences of title before the Commissioners which it becomes important to notice, because it was upon those that he relied to show that the prayer of his petition ought .to be granted. They consisted of certain proceedings alleged to have taken place before the Alcalde of San José Guadalupe in respect to the registry of the mine, and certain subsequent proceedings of the Junta de Fomento and other public authorities of the home government, which were introduced as showing a confirmation of the doings of the Alcalde in respect to the registry of the mine and an absolute grant of the two square leagues of land.
I.- Petitioners in such cases are required by the act of Congress not only- to present their claims to the Commissioners, but also the documentary evidences of title on which they rely to support the same; and in obedience to that requirement the *147 claimant presented the documents referred to in his petition, of which the following is a summary :
1. His petition, dated November 22d, 1845, addressed to the Alcalde of first nomination, representing that he had discovered a vein of silver with a ley of gold on the rancho of José Reyes Berreyesa, which he wished to work in company, and request ing the Alcalde, in conformity with the ordinance on mining, to fix up notices in public places of the jurisdiction, in order to make sure of his right when the time for the juridical possession should arrive, according to the laws upon that subject. Immediately following the petition is a certificate signed by Pedro Chábolla, certifying that the petition is a copy of the original to which he refers, and which certificate purports to have been executed on the 13th day of January, 1846, at the Pueblo of San José Guadalupe, and to have been signed in the presence of two assisting witnesses.
2. Claimant also introduced another document purporting to be a supplemental petition to the same Alcalde, dated the 3rd day of December, 1845, in which he represented that, in addition to silver with a ley of gold, he had, in the presence of several bystanders, taken out liquid quicksilver from the mine, and requested to add that statement to his previous representation in order to secure his right. ■ Both of the petitions purport to have been executed at the Mission of Santa Clara, and to liáve been signed by the claimant. Appended to the supplemental petition, also, is a certificate signed by Pedro Chabolla, which is .of the same date and in all respects similar to the one con uected with the first petition.
3. Following the last named petition and certificate is the document filed before the Commissioners as the copy of an original then relied on by the claimant as the proper evidence to show that he made due registry of the mine, and that the juridical possession of the same was duly given to him by competent authority in accordance with the regulations of the mining ordinance. Considering the importance of the document it will be given in full. Unlike what is usual in title papers *148 executed by Mexican officials, it has no introductory caption whatever, but the translation reads as follows :• 1
“There being no deputation on mining in the Department of California, and this being the only time since the settlement of Upper California that a mine has been worked in conformity with the laws, and there being no Juez de Letras, (Professional Judge,) in the Second District, I, the Alcalde of First Nomination, citizen Antonio Maria Pico, accompanied by two assisting witnesses, have resolved to act in virtue of my office for want of a-notary public, there being none, for the purpose of giving juridical, possession of the mine known as Santa Clara, in this jurisdiction, situated on the rancho of the retired sergeant José Reyes Berreyesa,for the time having expired which is designated in the ordinance of mining, for citizen Don Andres Castillero to show his right, and also for others to allege a better right, between the time of denouncement and this date, and the mine being found with abundance of metals discovered, the shaft made according to the rules of art, and the working of the mine producing a large quantity of liquid quicksilver, as shown by the specimens which this Court has; and as the laws now in force so strongly recommend the protection of an article so necessary for the amalgama'ion of gold and silver in the Republic, I have granted three thousand varas of land in all directions, subject to what the general ordinance of mines may direct, it being worked in company, to which I certify, the witnesses signing with me; this act of possession being attached to the rest of the espediente, deposited in the archives under my charge. This not going on stamped paper, because there is none, as prescribed by law.
“Juzgado of San José Guadalupe, December 30, 1845.- .
“ Antonio Maria Pioo.
“Assisting witnesses:
“ Antonio Suñol,
“José Noriega.”
Annexed to this document, or immediately following it, is a receipt signed by the Alcalde, and purporting to have been executed at the same time and place as. the principal document, in *149 which the signer certifies that he has received $25 on account of the fees for the possession of the quicksilver mine, named Santa Clara, which is in the jurisdiction under his charge.
4. Connected with the document, appertaining to the proceedings before, the Alcalde, is another of considerable importance in the investigation, which is dated the 2d of November, 1845, and is denominated in the transcript as the writing of partnership.
Like the preceding petitions, it was executed at the Mission of Santa Clara; and by its terms it purports to be a partnership between the claimant and José Castro, Secundino Robles, and Teodoro Robles, and José Maria R. S. del Real, for the working “ of a mine of silver, gold apd quicksilver, in the rancho of José Reyes Bérreyesa, in the jurisdiction of the pueblo of San José Guadalupe.” Article 1 provides to the effect that the claimant, “ conforming in all respects to the ordinance of mining, forms a regular perpetual partnership” with the persons before named, adding that “the half of the mine, which is that of which ke can lispose, will be divided into three parts” — that is, “four shares to José Castro, four shares to S. and T. Robles, and the other four shares” to the Padre Real, “ as a perpetual donation.” Parties were restrained by the instrument from alienating their shares ; and the provision was, that the expenses should be borne in proportion to the shares. Stipulation was also made that the claimant should have charge of the operations when present, but in his absence they were to be conducted by the Padre Real, and it was also stipulated that the agreement should be authenticated by Manuel Castro, the Prefect of the Second District. His certificate is appended to the document, in which he certifies, under date of the 8th of December, 1845, that it is a copy of the original, and the certificate purports to have been executed at Santa Clara, in the presence of the Alcalde, to whom the petitions were addressed. Congress recognized the existence of war between Mexico and the United States, oto the 13th of May, 1846, and it is not; denied that the official functions of the Mexican officers in that Department entirely ceased as early as the 7th of July in that year. Reference to these dates becomes necessary. *150 especially to the latter, because after that time the civil officers in that Department during tbe war were such as were appointed by our military commanders.
5. He also introduced • another certificate, which applies to each and all of the foregoing documents. It is signed by James W. Weekes, Alcalde of San José Guadalupe, and reads as follows:
“ I certify in due form, that the foregoing is a faithful copy, made to the letter from its original, the ‘espediente’ of the mine of Santa Clara, or New Almadén, which exists in the archives under my charge, to which I refer. And in testimony thereof I have signed it this 20th day of January, 1848.”
Eoui additional, certificates are also appended to this espediente, as it has been called in argument at the bar. • Of these, the first was executed at San Francisco, and is signed by James Alexander Forbes, British Yice-Consul, in which he certifies under date of the 21st of January, 1848, that the signature of the last named Alcalde is the true and proper handwriting of the person it represents. None of the other three were executed in California, but respectively bear date at Tepic, in the Department of Jalisco. One is signed by Jesus Yejar, a notary public, in which he certifies under date of the 15th of March, 1850, to the effect that the signature of the British Yice-Consul is gen uine. Another is, the signature of the first Alcalde at that place, in which he certifies under the same date that the mark and signature of the notary are those he is accustomed to use, and the last is the certificate of the Consul of the United States at that place, in which he certifies, under date of the 1st of December, 1850, that “ the signatures attached to the foregoing document are in the true handwriting of the subscribers.”
H. Other documents were also introduced by the claimant as showing a confirmation of the doings of the Alcalde in respect to the registry of the mine, and which it is insisted by his counsel establish his right to the two square leagues of land. They do not purport to be originals, but were admitted in evidence as sworn copies of originals, alleged to be on file in the archives of the Junta de Fomento, and other Departments of the Supreme *151 Government at the capital of the Republic. Briefly described, the documents of this class, introduced before the commissioners, are as follows:
1. Copy of a letter from the claimant, dated at the Mission of Santa Clara on the 19th of February, 1846, and addressed to Tomas Ramon del Moral, in which he states in effect that he has discovered an abundant deposit of cinnabar, and that he sends with the communication some of the ore and a little quicksilver, that it may be assayed.
2. He also introduced a copy of a letter from J. J. de Herrera, which was addressed to the same person as the preceding letter, in which the writer, under date of thé 13th of- April, 1846, pro fesses to give certain extracts from two letters received by him at the City of Mexico from the claimant, while the latter was at the Mission of Santa Clara. These letters, as described in the copy of the communication given in evidence, were dated on the 19th and 22d of February, in the same year, and the extracts represent the claimant as saying that at the .distance of five leagues from the Mission to the west he had discovered and denounced a very abundant mine of quicksilver, and that he had sent to his correspondent some of the ore procured from the top of the vein to confirm his statement, together with a little quicksilver which was taken out with the greatest facility.
3. Copies of two communications, showing that the specimens of ore so sent were submitted to the Junta Facultativa, and that an assay founded on a mean of the different specimens, gave a “ley" of twenty-five and a half per cent.
.4. Copy of a letter or report from the President of the Junta to the Minister'of Justice, under date of the 5th of May, 1846, communicating the fact of the reception of the specimens of ore and of the successful result of the assay.
5. Copy of the reply of the Minister of Justice, dated four days afterwards, in which he states that the President ad interim of the Republic' learns with satisfaction that the claimant has discovered a deposit of quicksilver of excellent quality.
6. Claimant also introduced a copy of a communication signed by him under date of the 12th of May, 1846, addressed to the *152 Junta for the encouragement and administration of mining, as fully set forth in the transcript.
Referring to his discovery as a mine of quicksilver in the Mission of Santa Clara, he states that he has denounced and taken possession, not only of said mine named Santa Clara, but also of an extent of three thousand varas in all directions; that he has formed a company to work it, constructed the pit, and complied with all the conditions prescribed by the ordinance. Intimation is there given that he could easily have secured aid from foreign houses, but that he preferred that the establishment should be entirely national, and for that reason had not hesitated to apply to the Junta for such assistance as he at present needed. His representation was that he only wanted a small advance of $5,000, on account of the scarcity of' coin in that ■ Department, and an immediate remittance to the mine of retorts, cylinders, and other small distilling apparatus, and also iron flasks for bottling up the quicksilver.'. He suggested that he would have proposed a contract of partnership to the Junta as an avio, or some other agreement, if there had been time to fur.nish the proofs and details which would -be -required for such an arrangement, but being obliged to leave the capital within a few days, he found it necessary to restrict himself to “ that whieh appears to present no difficulty and which may open a way to a future agreement.” What he desired of the Junta was not only that they should accede -to his requests as far as they had the power, but that they should send such as they could not grant to the Supreme Government, recommending ■ their adoption, and with that view he submitted nine propositions, which were as follows:
■ “First. The Junta, in the act of approving the agreement, will give- me a draft for $5,000 on some mercantile house in Mazatlan.
“Second. On my part, I bind myself to, place in said port, within six months after-leaving it, fifty quintals of quicksilver, at the rate of $100 each, which I will send from the first taken out, with absolute preference over every other engagement..
. “ Third. The Junta will order that there be placed at my dis *153 position before leaving tbe capital, tbe eight iron retorts which it has in its office, and all the quicksilver flasks which can be found in the negociación of Tasco, which are fit for use; and, lastly, it will deliver tó Señor Don Tomas Ramon del Moral, my attorney, the sums to pay for the retorts, cylinders, and other kinds of small apparatus, which may be ordered to be made for the negociación, to the amount of $1000.
“Fourth. I will receive the retorts of the Junta at cost price, and the flasks which I may select at $2 a piece, agreeably with their valuation.
“Fifth. The ascertained value of said retorts and flasks, and that of the sums which may be delivered to Señor Moral, I will return in the term of one year from this agreement, -and also the premium on the draft on Mazatlan, in quicksilver, placed in said ■port at the price, of $100 the quintal; but if the Junta should wish to take one or more 'acciones’ in the mine, it shall be left as a part payment of the sum corresponding to one or more ‘barras.’
“ Sixth. While the company is being formed, during the period of one year, counted from the date on which this agreement shall be approved, and the $5,000 spoken of in the first proposition being paid, I will give the preference to the Junta in the sale of quicksilver placed in Mazatlan, at the rate of $100 the quintal.
“ Seventh. The Junta shall represent to the Supreme Go vernment the necessity of approving the possession which has been given me of the mine by the local authorities of .California, in the same terms as those in which I now hold it.
“Eighth. It shall also represent the advantage of there being granted to me, as a colonist, two square leagues upon the land of my mining possession, with the object of being able to use the wood for my business.
“Ninth. For the compliance of this contract I pledge the nine itself and all its appurtenances.”
7. On the 14th of the same month the President of the Junta communicated the letter of the claimant, or petition as he calls it, to the Minister of Justice, and in that communication the mine is described as the quicksilver mine in the Mission of Santa *154 Clara in the Department of California. Claimant also introduced a copy of that, communication. Among other things, the writer states that the Junta " has no hesitation in recommending the petition” to the favorable consideration of the Government; that they, the Junta, are of the opinion that the sum of $5,000 should be advanced to the applicant on the terms proposed, and that they should be authorized to furnish him with such iron retorts and flasks as they had on hand, and to advance him the other $1,000 asked, which, as they stated, could be employed in the construction of retorts, cylinders, and other small apparatus for the use of the mine.
They also refer to the reasons assigned by the claimant for deferring the formation of a contract of partnership, or avio, and state, in effect, that they, the Junta, regard it as satisfactory. Reference is also made to that part of the claimant’s petition in which he represents that he has denounced and taken possession not only of the mine, but also of an extent of three thousand varas in all directions, and their views upon that subject were, that the possession given by the local authorities was “ not íd conformity with the ordinance,” because it embraced an extent greater than the ordinance allowed, but, notwithstanding that fact, they presented various arguments for the consideration of the Department to show, that, under the circumstances of the cases, it might be sustained. In respect to the two square leagues of land solicited by the claimant as a colonist, the Junta declined to express any opinion for or against the application for the reason, as stated, that they had' no information upon the subject, and therefore left that matter to be decided by the President as he might think proper.
• 8. Both the petition of the claimant and the recommendation of the Junta were, by the Minister of Justice, laid before the President, and the former on the 20th of May, 1846, sent a dispatch to the' Junta, informing them that the President had been pleased to approve, in all its parts, the agreement made with the claimant, “ in order to commence the working of said mine,” and that the corresponding communication was made to the Minister of Relations to issue the proper orders respecting that *155 which was contained in the eighth proposition for the grant of lands in that Department. Under the same date a-decree, so called, was entered by the Minister of Justice in the margin of the communication received by him from the Junta, in the following terms: “ Granted in the terms which are proposed, and with respect to the land ; let the corresponding order issue to the Minister of Relations for the proper measures of his office, with. the understanding that the Government' accedes to the petition.” Copies of the dispatch of the Minister of Justice and of the last named document were also introduced by the claimant.
9. On the same day, the Minister of Justice sent a dispatch to the Minister of Relations, informing him of what had been done;' in which it is also stated, that the President had acceded to the petition of the claimant, and that the dispatch was transmitted to the end that there might be granted to the claimant, as a colonist, two square .leagues upon the land of his mining possession. Copy of that dispatch was also introduced by the claimant:
10. Finally, the claimant introduced, a copy of a dispatch from. the Minister of Relations to the Governor of California, dated on the 23d day of May, 1846, in which the former, after-transcribing the dispatch to him from the Minister of Justice, and incorporating a copy of the same into his own dispatch, as an explanation of the • transaction, adds as follows: “And I. transcribe it to your Excellency, that in conformity with the provisions of the laws and decrees relative to colonization, you may give Señor Castillero possession of the two square leagues above mentioned.”
Remark should be made, that in alb of the documents introduced as copies of originals on file in the Department of the Supreme Government, the mine is described as one discovered by the claimant in the. Mission of Santa Clara; and in no one of them is any allusion made to the fact that it was situated on the rancho of José Reyes Berreyesa, as represented in the first petition of the claimant, and repeated in the act of juridical possession alleged to have been executed by the Alcalde.
*156 11. Parol testimony was also introduced by the claimant in support of his claim, both to the mine and to the two square lea gues of land, to which some brief reference will be made. He proved by Charles S. Lyman, that he, the witness, made a survey of the land around the mine in the month of February, 1848, at the request of James Alexander Forbes, of California, and Alexander Forbes, of Tepic, in Mexico, who was at the mine at the time of the survey. His orders were to lay out two square leagues; and he states that he was shown a grant, or a copy of a grant, for that quantity from the Mexican (Government. They requested him to locate the grant so as to' 'cover certain mining rights called “ pertenencia,” extending three thousand varas in every direction from the mouth of the mine; and he states that it was so surveyed as to have the mouth of the mine as nearly in the centre as could be without covering land of the neighboring ranchos claimed by individual owners. Field notes of that survey were exhibited, and Fernando Alden, who was also examined by the claimant, testifies that he assisted in making a part of it, and he confirms the testimony of the first witness as to the location of the alleged grant. By his testimony it also appears that he heard of the grant in 1846, when he was in Mexico, and that he was employed by Alexander Forbes, the agent and partner of the claimant, to go to California for the purpose of working the mine, erecting buildings, and occupying the land so granted; and he testifies that he first went to live on the land about the 1st of April, 1847, and continued to reside there until about a year before he gave his testimony, acting as the agent and overseer of the company holding under the claimant. Witnesses were also examined by the claimant to prove that the copy of the act of possession executed by the Alcalde, and the other papers included in that espediente, were true copies of the originals, and that the originals were genuine documents. To prove these facts, he called and examined Frank Lewis, Deputy Recorder for the County of Santa Clara, who, upon being shown a certain paper entitled “ Posesión de la mina de St“ Clara de Año 1845,” stated that he obtained it from the office .f the Recorder of that county. Having made that state *157 ment, the witness was then requested to compare the. copies filed in the case with the corresponding parts of that paper; and after naving done so, he testified that they were true and exact copies. Two witnesses,-Antonio Suñol and José'Noriega, who, it will be remembered, were the assisting witnesses to the act of possession executed by the Alcalde, were also called and examined by the claimant in respect to the authenticity of the supposed original document. They were accordingly requested to examine the same, and having complied with that request, respectively testified that all the signatures, including their own, were genuine. Claimant also called and examined José Maria La Fragua ■ in respect to the class of documents introduced as copies of originals on file in the archives of the Supreme Government, and his testimony was to the effect • that he had compared all those documents with the originals in the City of Mexico, and found them to be correct.
Commissioners, or a majority of them, adjudged that the claim to the mine was valid, and confirmed the mining right or privilege of the claimant, as pertenencia, to the extent of three thousand varas in all directions from the mouth of the mine; but they unanimously adjudged the claim to the two square leagues of land to be invalid, and rejected that part of the claim.
Appeal was taken both by the claimant and by the United States to the District Court of the United States for the Northern District of California.
Much additional documentary evidence was introduced in the District Court, and'more than one hundred additional witnesses were examined in respect to the matters involved, or supposed to be involved, in the controversy. Parties were' fully heard, and on the 18th day of January, 1861, the.District Court entered a decree confirming the claim to the mine, but’ diminishing the mining right, or privilege, as compared with the decree of the Commissioners, and adjudging the claim to the two square leagues of land to be invalid and rejecting the same, By the terms of the decree, the mining right, or privilege, of the,claimant is described and defined ns ‘"a piece of land embracing a superficial area, measured on a horizontal plane, equivalent to *158 seven pertenencias,” regarding each pertenencia as a solid of a rectangular base two hundred varas long, of the width established by the ordinance, and in depth extending from and, including the surface, to. the centre of the earth.
Whereupon both parties appealed to this Court. No. 123 is the appeal of the claimant, and No. 133 is a cross-appeal of the United States.
Power to decide upon the validity of any .claim presented to land in California, by virtue of any right or title derived from the Spanish or Mexican Government, as matter of original jurisdiction, is, by the Act of the 3d of March, 1851, exclusively con-' ferred upon the Commissioners appointed under the first section of that Act. Appellate jurisdiction, however,- is conferred upon the respective District Courts of the United States for the Northern and Southern Districts' of California, and finally upon this Court. In deciding upon any such claim, the rule of decision is, as prescribed by the eleventh section of the Act, that the Court' or tribunal making the decision shall be governed by the treaty under which the lands were acquired, the law of nations, the laws, usages, and customs of the government ceding the same, the principles of equity, and the decisions of this Court, so far as they are applicable.
III. Enough has already been remarked, in view of those provisions, to show that there are three principal questions involved in the record of very considerable importance.
First. Whether the claim of the petitioner to the two square leagues of land, under the rules of decision already mentioned, is shown by. the documentary and other evidence to be a valid one within the meaning bf the eighth section of the Act providing for the adjudication.
Secondly. Whether the Commissioners had jurisdiction to decide upon the validity of the claim to the mine and mining right, or privilege, as described in. the petition; or in other words whether the claim to the mine, together with the pertenencias to the same, as recognized -in- the Mining Ordinance, is a claim to land within the meaning of the provisions of the 8th section of that Act.
*159 Thirdly. Whether the claim to the mine, including the mining right, .or privilege, as set forth in the petition, is shown by the documentary and other evidence to be a valid one under the rules of decision already described.
1. Title to the two square leagues of land, it is insisted, became vested in the' claimant by virtue of the documents on file in the Department of the Supreme Government, as evidenced by the copies filed in the case at the time the petition was presented to the Commissioners. They consist, it will be remembered, so far as that part of the claim is concerned, of the communications from the claimant to the Junta de Fomento, their report or recommendation to the Minister of Justice, his reply to the same, together with the decree made by him in the margin of their communication, and his dispatch to the Minister of Relations, and the dispatch of the Minister of Relations of the 23d of May, 1846, to the Governor of the Department where the land was situated. Forty witnesses or more, mostly from the City of Mexico, were examined by the claimant to prove the authenticity of those documents, or of the corresponding originals, on file in the archives of the Supreme Government, and various other proofs, in the form of exhibits, were also introduced for the same purpose, filling a large space in the transcript,which contains more than three thousand five hundred pages of closely printed matter.
Such testimony and proofs were regarded as essential, because it was and is insisted by the United States that the documents were fabricated, but in the view we have taken of the case it will not be necessary to decide or consider that question, and consequently ■ neither the testimony pf the witnésses or the exhibits on that point will be, reproduced... According to the evidence introduced by, the claimant, .^M^iano Parades y Arrillaga, assumed the functions of President adñi$pr,im of fthe Republic on the 15th day of December, 1845, and-the same prpofs show that he continued in authority as. such, until the 29th day of July of the following year, when he surrendered his power, and for a time took command of the army.
Counsel for. claimants assume that during that period the *160 President was in the exercise of extraordinary powers, aid it must be conceded that the evidence is full to that effect, although it may well be doubted whether such of his official acts as were in violation of law have ever been ratified by the Mexican Government. Assuming that the President was in the exercise of extraordinary powers on the 23d day of May, 1846, the claimant insists that the dispatch of that date from the Minister of Relations to the Governor of the Department of California, especially when it is considered in connection with the marginal decree and dispatch of the Minister of Justice .of the 20th of the same month, is of itself an absolute ’ grant of the two square leagues of land described in his petition.
Conceding the power of the acting President of the Republic to make such a grant of the public domain, the question then is one of construction, and in that view of the case it becomes necessary to examine with care so much of the several documents as relate to the claim for the two square' leagues of land. Petitioner’s representation to the Junta de Fomento was that he desired' such a grant in order that he might be able to procure sufficient fire-wood for his mining works, and the effect of his request, as stated in his eighth proposition, was that they, the Junta, should recommend to the Supreme Government that there be granted to him, “ as a colonist,” two square leagues upon the land of his mining possession. When he- made that request for a- grant as a colonist he evidently referred to the colonization laws as containing the authority to comply with his request and make the grant. Those laws had then been in operation for more than twenty years, and consequently he must have expected, even if the Government acceded to his petition, that the grant wolild be' issued in conformity to those laws, and of course must be executed by the Governor, subject to the approval of the Departmental Assembly.
Such also was the view taken of the matter by the Junta in their communication to the Minister of Justice, • as plainly appears from the language employed by them in describing his eighth proposition. They refer to it as a petition in which the' claimant solicits as a colonist two square leagues of land “upon *161 tbe surface of his mining property for the purpose of supplying himself with the fire-wood necessary for the reduction of the ores,” evidently showing that they regarded it as an application under the colonization laws. Nothing is expressed in the decree or memorandum made by-the Minister of Justice in the margin of the communication from the Junta which, if .rightfully understood, affords any countenance whatever to the views of' the claimant. Reliance is placed upon the introductory words, to wit •: “ Granted on the terms proposed,” but it is so obvious from what follows’ in the same connection, that those words refer to the terms proposed as an arrangement for exploring and operating the mine, that it is difficult to see how any one can be misled in regard to their import. Justification for that -remark will be found in the directions immediately given “ with- respect to the land," which are that the corresponding order be issued to the Minister of Relations for the proper measures of his office, with the understanding that the' Supreme Government accedes to the petition. Strong doubts are entertained whether the order, “with- respect to the land,” was intended as anything more than the usual office direction to the corresponding clerk in the Department to prepare and put in form a dispatch upon the subject which should express the views embraced in the marginal directions.
Support to that view is certainly derived from the fact that a dispatch was prepared and sent on the same day, which, in its concluding sentence, contains substantially the same language, in the.form of a request that the “orders corresponding” may be issued. Other matters, however, are stated in the dispatch which ought not to be overlooked. After stating the fact that he had laid the communication of the Junta before-the President, he proceeds to say that “ His Excellency had been pleased to approve, in all respects, .the agreement made with the claimant m order to commence the working of said mine,”'adding that he communicates the information that there may be granted to the claimant, as a colonist, the two square leagues of land, and requesting the Minister of Relations “to issue orders corresponding.” Additional orders, therefore, were assumed to be necessary, and *162 the concluding sentence of tlie dispatch to the Minister of Relations. written on the same day, and already referred to, shows what kind of orders were contemplated at the time the marginal . decree was made. Prepared as those documents were on the same day, they must be considered together, and when, so considered, it is clear and beyond doubt, that the marginal decree with respect to the land was not drafted or intended as a grant or any evidence of a grant; for if it had been, the officer who drafted it never would have asked for any order upon the subject from a co-ordinate Department of the Government.
Request was made by the claimant, in the first place, that_ a grant might be made to him as a colonist, and it conclusively appears, we think, from an examination of those dispatches, that the Mexican officials who wrote them never for a moment con templated that the claimant was to- have a grant of land in any other mode than by the usual proceedings under the colonization laws. Abundant confirmation of that proposition, if any be needed, is to be found in the dispatch from the Minister of Relations to the Governor of the Department, which is the document that the claimant professes to regard as an absolute grant of the land described in his petition.' Mexican officials, in their correspondence upon official matters of domestic concern, usually transcribe and incorporate into their own dispatches such communications as they have previously received upon the same subject from other official sources. Such was the course pursued by the Minister of Relations in his dispatch to the Governor of the Department. He accordingly- transcribed into his dispatch a copy of the one sent to him from the Minister of Justice, in which is also contained a copy of the before mentioned communication to the Junta, and referring to the entire dispatch, he state's in effect, that he transcribed it to the Governor in order that he, the Governor, in conformity with what is prescribed by the laws and dispositions upon colonization, may . put the claimant in possession of the two square leagues of land • which are mentioned in the communication. Conformity to the laws an i regulations upon the subject of colonization grants is plainly , contemplated and required by the directions of that *163 dispatch, and consequently it is clear that the Governor could not put the claimant into the possession of the described tract in. any other mode than by the usual proceedings under those laws.
2. Claimant calls this a grant, and it is his privilege to do so if he sees fit; but it is ■'min for him to expect that this Court can give its sanction to any such manifest error. Vacant lands in California belonged to .the Supreme Government, and the laws for the disposition of the same emanated from that source. U. S. vs. Knight, (1 Black, 242.)
General rules and regulations upon the subject were accordingly ordained, authorizing the Governors of Territories, under certain specific conditions, to grant such lands to such of the persons therein described as might ask for the same for the' purpose of settlement and cultivation. Persons soliciting such lands were required by those rules and regulations to address a petition to the Governor, setting forth their names, country,' profession and religion, and also to describe the land asked for as distinctly as possible, by means of a diseño or map annexed to the "petition. He was not required to prove his representations, but it was made the duty of the Governor to obtain the necessary information to enable him to determine whether the case fell within the conditions specified in the regulations, both as regarded the applicant and the land. None of these conditions, of course, were ever complied with, because the proofs show, and it is conceded, that the dispatch was never transmitted- to the Governor, and that the claimant never returned' to- that Department. Application for a ■ grant was never made under that dispatch, and so far as appears, the Governor of the Department was never informed that it had been issued. Unless the lands were vacant, such an application would have been fruitless, as the Governor had no power to, grant any other than vacant lands. Suppose it to be true that the mine is on the rancho of José Reyes Berreye'sa, or that of Justos Darios, then the power of the Governor to make .he grant was entirely wanting ; and it would not benefit the claimant if it were now shown that the mine was and is on public land; because, if his representations are to be credited, he, and all those associated with *164 him, fully believed that it was not a part of tl e public domain. . Contrary to this view, it is insisted by tbe claimant that inasmuch as the President, by whose direction the dispatch was issued and delivered to the party, was in the exercise of all the powers of- Government, the non-delivery of the dispatch to the Governor of the Department is wholly immaterial, that the dispatch itself was -a decree of concession, and the placing it in the hands of the grantee was a sufficient delivery to vest an equitable title at least in the claimant.
3. Power in the President to make such a grant is not denied by the United-States; but the question is, whether he exercised or • attempted to exercise any such power, which under the circumstances must depend upon the construction to be given to the dispatch of the Minister of Relations addressed to the Governor of the Department. Explanations already given show to a demonstration, we think, that such is -not the true construction of the dispatch, and consequently the proposition of the claimant cannot be sustained, and in rejecting the proposition as untenable, we place our conclusion upon the ground that the proposition assumes an erroneous construction of the dispatch under consideration, and is based entirely on that assumption.
A. Attempt is made to support the proposition by some of the remarks of this Court in the case of U. S. v. Castillero, (23 How., 468,) but it is evident that the construction given to the opinion of the Court in that case is quite as erroneous as that given to the dispatch of the Minister of Relations.' Title to the island of Santa Cruz, near the coast of that Department, was claimed in that case by virtue of a regular grant from the Governor. Such grant it is true had been issued by the Governor, under a special-dispatch from the Minister of the Interior, but the statement is nevertheless correct that the claimant held the island under a formal grant which was in the list of grants included in the Jimeno index. Lands of the islands prior-to the 20th day of July, 1838, had never, been granted by the Governor of that Department, and the better opinion is that the colonization laws did not confer tjie power to make such grants. Authority upon that subject was on that day conferred ;upon the Governor in *165 connection with the Departmental Assembly by a general order, as is more fully explained in that opinion. Direction was given to the Governor on the same day by a special dispatch that one of the islands, such as the claimant in that case might select, should be assigned to him before they proceeded under the general order. He accordingly selected the island mentioned, and the Governor issued title papers to the donee. Objection was made here' to the confirmation upon the ground that the grant had never been approved by the Departmental Assembly, but the Court overruled the objection. Absolute directions Were given in that case in respect to lands not authorized to be granted under the colonization laws, and the power so conferred had been exercised and the doings of the Governor in making the grant acquiesced in for a period of eight years before the jurisdiction of the territory was acquired by the United States. Compare that statement, which is -undeniable, with the facts of this case and it is obvious that the supposed analogy utterly fails.
By the terms of the dispatch under consideration the proceedings in this case were directed to be "in conformity with what is prescribed by the laws and dispositions upon colonization,” and of course the discretion of the Governor and that of the Departmental Assembly were to be exercised in the performance of their respective duties underthe obligations imposed' by law. Something also remained to be done by the claimant in order to call forth the exercise of that, discretion. He must prepare and present his petition describing the land, and he must also prepare and present, if required, a diseño or map of the land in order that the Governor might have the means of ascertaining whether the tract solicited was vacant and so situated that it might properly be granted to the applicant. No such petition was ever presented, and no action of any kind ever took place upon the subject. But we forbear to pursue the comparison, as it must be obvious, we think, to every unprejudiced mind, that the two cases are in no substantial respect alike. Eor these reasons we are of the opinion that the claim to the two square leagues of land, cannot be sustained.
*166 IV. Before entering upon the examination of the questions involving the validity of the title of the claimant to the mine and mining right or privilege claimed by him, it becomes necessary to consider and decide the question whether the Commissioners under the Act of the 3rd of March, 1851, had jurisdiction over such a claim. Counsel for the claimant maintain the affirmative of that question,'but the jurisdiction of the Commissioners is dénied by the counsel of the United States upon several grounds:
1. They' insist, in the first place, that the ownership of a mine under the Mexican law was not the ownership of the land in ■ which the mine was situated; that it was simply the ownership of the right to take from the soil the minerals therein to be found, and was recognized as a right, severed from all public and private land which was vested in the sovereign and which did not pass by a grant of the land, and was capable of being acquired only by a title from the sovereign power, wholly distinct from the title to the land.
2. Several of those propositions, if properly restricted and rightly applied, may well be admitted, because when so restricted ' and applied they are ^undoubtedly correct. Mip.es under the Mexican law may be -the subject of rightful ownership, distinct from the land as such for agricultural or other ordinary uses. Ownership of a mine, however, as secured under the mining ordinance by registry and juridical possession, does not consist alone in the right- to take from the soil the minerals therein to be found, but it also embraces, if necessary to the working of .the mine, a. right to the exclusive possession and use of the surface of the land for an indefinite period within the boundaries of the pertenencias appertaining‘to the mining right or privilege. Such rights are by law regarded as severed from private land and also from public land when granted by the usual forms of conveyance fpr agricultural or other ordinary purposes. Gamboa by Heathfield, p. 132, sec. 5. EÍights to a mine not registered can only be acquired from the sovereign power, and it is true, as corttended by the United States, that the forms of such a con- ' veyance are .wholly distinct from those employed in the ordinary *167 process of granting lands. ' Another branch of the same proposition, not yet reproduced, may also .be admitted in the same qualified sense. Mining rights under Mexican laws undoubtedly are usually held upon conditions not affecting the title to the land as derived under the ordinary conveyances, and it is also true that such rights may be acquired and held by others besides the owner of the land under the ordinary grants, and that such rights are terminable when by their use the minerals contained in the soil are wholly removed. Granting all this, still the question arises whether a mine, together with the mining right or privilege appertaining to the same, is not land within the meaning of the Act of Congress under which the Commissioners were appointed. Persons claiming lands in California by virtue of any right or title derived from the Spanish or Mexican Governments are required to present the same to the Commissioners for adjudication, and of course the Commissioners have jurisdiction to decide upon the validity of all such claims. 9 Stat. at Large, 632.
S. Questions concerning miñes and mining rights in Mexico depend in a great measure upon the provisions of the Ordinance of the 22d of May, 1783, which, although ordained long before her independence, by the sovereign of the parent country, is still in force and constitutes the principal code of the Republic upon that subject. Omitting unimportant words,‘article 1, of the 5th title, reads as follows: Mines are the property .of my royal crown as well by their nature arid origin as by their reunion declared bylaw. Article'2 contains the following provision : Without separating them from-the' royal patrimony I grant them to my subjects in property arid -'possession.' in such manner that they may sell them, rent them, pass them by will, either in the way of inheritance or legacy, or iri any other mannei alienate the right which in the mines belongs to them, on the same terms in which they themselves possess it, and to persons capable of acquiring it. Rockw. on Mines, p. 49 ; Halleck Coll. 222. ■
Discoverers of a new mine in which no pit or shaft had beer opened might acquire three pertenencias, and if worked* in com *168 pany a certain additional number not exceeding seven in all. Writers" do not exactly agree as to wbat is a pertenencia, but the better opinion is that it is a square of two hundred varas, or five hundred and fifty feet. Prima facie, the owner of freehold lands, says Bainbridge, is entitled to all the minerals on and underneath the surface with the exception of royal mines, but he admits that the rule just stated is only a presumption of law, and that a mine may form a distinct possession and inheritance by the production of a title distinct from that to the surface. Bainb., p. 4. He also admits that when mines form a distinct inheritance and are not attached to the ownership of the lands in which they are situate, or form a part of a demesne of a manor, a title to them may be acquired or lost in the same manner as to a common estate of freehold. Bainb., p. 31. Property in minerals unsevered from the land, says Collyer, whether held together with or separately from the property in the. land, is what the law terms a corporeal hereditament, as distinguished from the mere right to work for them, which is an incorporeal hereditament; and he also says that an estate in minerals is considered an estate in land, and is transferable only under the same restrictions, whether conveyed with or without a conveyance of the adjacent soil. P. 1.
4. Courts of justice also have had occasion to assert the same general principles. Plaintiff-, in ejectment was allowed, in Turner vs. Reynolds, (23 Penn. R., p. 199,) to recover a coal mine which be had described in.his writ as land, although his title was under a conveyance to him, not of the tract of land, but of the coal which was unsevered. Coal and minerals in place are land, say the Court in Caldwell vs. Fulton, (31 Penn. R., 483,) adding in the same connection that it is no longer to be doubted that the/ are subject to conveyance as such. Minerals beneath the surface of the land, it' is held in the same case, may be conveyed by deed, distinct from the right to the surface, and in enforcing that view the Court remark that nothing is more common in that State than that the surface right should be in one and the mineral in another, and we have, no doubt that the rule there laid down is correct. Comyn vs. Wheatley, (Cro. Jac., 150.)
*169 Regarding the claim to be fully proved as set forth, in the / petition, which is the proper view to take of the case in determining the question under consideration, we are of the opinion that the objection to the jurisdiction of the Commissioners cannot be sustained, and it is accordingly overruled. Rockw., chap. 11, p. 519-529; 530-532.
Y. Having come to that conclusion, it becomes, the duty of this Court to examine the third question presented for decision, which, is, whether the claim to the mine, including -the mining right or privilege as set forth, in the petition, is shown by the evidence to be a valid one within the rules of decision already described.
1. Property in mines not discovered, and registered according to law, whether the mine was on public or private lands, was vested, as has already appeared, exclusively in the Supreme Government, so that private persons could not acquire it or any interest in'it in any other mode than that prescribed in the provisions of the mining ordinance. Reference therefore must be made to those provisions to ascertain what they are and what the discoverer is required to do in order to acquire such a property. Persons discovering one or more mineral hills absolutely new, in which there is no mine or trial pit open, may, under article 1, title 6, of the ordinance,, acquire, in- the principal vein which they may select, three pertenencias, continuous or interrupted, according to certain prescribed measurements, and if they have discovered more than one vein they may have one pertenencia for each, to be determined and marked out within the term of ten days.. Halleck Coll., p. 223, title 6, art. 1.
Discoverer of a new vein in a hill known and worked in other parts may have in it two pertenencias, provided he specifies them witbin ten days, as mentioned in the preceding article; p. 223, art. 2. Article 3 provides that he who asks for a new mine in a vein known and worked in other places shall not bé a diseoveier. Such persons as are described in the preceding articles who desire to secure the benefit of those provisions are required by article 4 of the same title to present themselves with a wi itten statement before the Mining Deputation of that *170 Territory or the nearest one, should there be none there, stating in it their names and those of their partners, if they have any, the place of their birth, their residence, profession and employment, and the most particular and distinguishing feature of .the place, hill or vein, of which they ask adjudication; all of which circumstances and the hour in which the discoverer presents himself shall be noted in a book of registry, which the Mining Deputation and Notary, if there be one, shall keep, and this being done, his written statement shall be; returned to him. attested for his due security. Notices are then to be affixed to the doors of the church, the Government houses; and other public places of the town for due information, and the command is that the discoverer within ninety, days shall make or cause to be made, in the vein or veins of his registry a pit or well (pozo) of one and a half varas in diameter at its mouth and ten varas deep, and that as soon as this shall be done, ofie of the deputies shall personally go, accompanied1 by the Notary, if there be one, and if' there be none, by two assisting .witnesses, and by the professional mining expert of that Department, to inspect the course and direction of the vein, its width, its dip or inclination to the horizon, called lay or slope, its hardness or softness, the" gfeater or lesser solidity of its sides, and the kind or principal indications of the mineral, taking .an exact account of all this in order that it may be added to the corresponding part of his registry, with the evidence of possession, which shall immediately be given to him in the name of the sovereign measuring to the party his pertenencias, and causing him, as required in the subsequent directions of the ordinance, to fix stakes in his boundaries. Following these regulations, an,d as the conclusion of the article in which they are’ contained, it is ordained to the effect that when all this .is done “ there will be delivered to him an attested copy of the proceedings as a corresponding title.” ’
Contestants appearing during the ninety days may prefer a counter claim, and in that event it becomes the duty of the tribunal to adj idge the right- to him who shall make the better proof but no one shall have any right to be heard unless ha’ *171 Bhall appear within that time. Halleck Coll., p. 224, arts. 4 and 5.
Strict compliance with the law is required, as- appears by all the writers upon the subject, and the 13th article, of title 19, provides in effect that the regulations shall be executed with’ the greatest exactness, precisely as they are written and i&tended. Halleck Coll., p. 307; Rockw., p. 110; Thompson on Mines, 183.
Properly speaking, says Gamboa, the register is the book in which deeds and grants are entered for perpetual remembrance thereof, so that if they be lost, torn or defaced, or if any question be raised as to their identity or authenticity, recourse may be had to such book. Registry, says the same author, is the basis of a title to a mine, ahd the attributive cause of the subject’s right, of property in it; the Crown having subjected the proprietor to this obligation when he made the mines common, so, that "no mine can be lawfully worked until registry is made, without which it is liable to be registered by any other person; the form of .the ordinance not having been complied with.” Although that commentary was written before the date of the ordinance' which must furnish the guide in this case, still the views of the writer have an important bearing upon the questions .presented, as showing the universality of the rule, that not even the discoverer can acquire any'title to a mine without registry. Gamboa, pp. 143, 145. ■
' 2. Petition in this case was presented to the Commissioners on the 30th day of September, 1852, and on the 8th day of January, 1856, their decree was made, confirming the claim to the mine and to the entire mining right or privilege as therein set forth. When the petition was filed, the claimant, as required by law, also presented the documentary evidences of title on which he relied to show that the claim ought to be confirmed Throughout the whole period that the case was pending before the Commissioners, those documents appear to have remained on file as the foundation of the claim, and were finally urged upon the consideration of that tribunal as true copies of originals existing in the office of the magistrate before whom thev *172 purported to have been executed. Pinal adjudication was made . by the Commissioners and the claim confirmed upon that ground, and so far as appears, without the- slightest suspicion that the ' copies filed in the case as documentary evidence under the Act of Congress were not true copies of originals on file as alleged, or that the originals did not import absolute verity. They of course regarded the documents as authentic, and considering how fully they are attested by official certificates, and that all of the signatures were' thoroughly proved by the positive testimony of two witnesses, it is difficult to see how they could have come to any different conclusion, especially as there was no opposing evidence in the case. Additional testimony, however, of a very important character was taken upon the subject in the District Court while the case was pending there, and it now becomes the duty of this Court to decide the question upon a very different state of facts. Other parties it seems, besides the petitioner, are interested in this claim, and in order that the evidence may be understood, and the testimony of the witnesses properly appreciated, it becomes necessary to advert to the cir- • cumstances under which some of these parties acquired their supposed title.
According to the testimony, the mine is within the county of Santa Clara, and is situated in a spur of the Sierra Azul or Blue Mountain, some sixteen or séventeen hundred feet above the level of the sea, and fifteen miles southwardly from the city of San José. Discovery of mineral there was first made by the Indians at a very early period, and they were accustomed to obtain the mineral and use it for paint. Civilized men also had knowledge, of the mineral and of the location of the mine more than twenty years before the discovery made by the claimant, but it no where appears that any one had discovered that the mineral • contained quicksilver. Two persons, Antonio Suñol and Louis Chaboya erected a mill on a stream in that neighborhood some time during the year 1824, and tried to get silver out of the mineral. People generally knew that there was a mine there, but they did not know what kind of a mineral it contained. By authority of the Government the claimant, in'the *173 autumn of 1845, made a journey to the fort of John A. Suttei, to negotiate with the proprietor for its purchase. Proceeding from Monterey, he and his party, consisting of José Castro and four others, besides a guard of some twenty soldiers, travelled on the route leading through Santa Clara, and his testimony shows -that when near that place this mine was mentioned by his principal companion. While there, some of the specimens of the ore were shown to him, and one of the witnesses testified that he visited the mine. Some examination of the mineral was • made by him at that time, but he presently left and pursued his journey to Sutter’s fort, where he arrived on the 11th day of November, 1845. Remaining there but a short time, he then returned to Santa Clara, where he pursued his investigations by certain rude experiments, and discovered that the mineral con •tained quicksilver. His first step, as alleged, was'to form a partnership for working the mine. Such an instrument bearing date the 2'd day of November, 1845, is one of the documents which was filed with the petition. Original interests in mines are usually acquired under a division of the mine into twenty-four parts, called barras or shares, and by reference to' the instrument of partnership it will be seen that it was framed upon that principle. Four shares were assigned to, José Castro, four shares to S. and T. Robles, four'shares to the Padre Real and twelve shares were retained by the claimant. They commenced working the mine in a small way, and the claimant remained there until some time in the month of March or April following, when he left for the City of Mexico and never returned to that Department. Affairs of the mine were left, at least for a time, in hands of the Padre Real.
On the 18th day of January, 1846, James Alexander Forbes, British Vice Consul for California, wrote to Eustace Barron, of, the firm of Barron,, Forbes & Co., at Tepic, that the claimant was working a quicksilver mine near the Mission of Santa Clara •Alexander Forbes of the same firm and British Vice Consul a Tepic, on the 15th day of April, 1846, wrote to J. A. Forbes requesting the former to furnish him as correct information-as possibl i respecting the quicksilver mine mentioned in his pre *174 ceding letter. Possession of the mine' was, prior to the 22d day of September, 1846, delivered to James Alexander Forbes by the Padre Eeal, the agent of the claimant, as appears by the fact that on that day he wrote to Alexander Forbes, of Tepic, that he whs in charge of the mine and was about making a bargain for four shares. Two shares were purchased by James A. Forbes of S. & T. Eobles about the time he took possession of the mine. Arrangements were made with equal activity by Alexander Forbes to get control of the same property. On the 24th day of November of the same year he instructed his agent in the City of Mexico to purchase shares for .him of the claimant, and on the 28th day of the same month he concluded with the agent of José Castro a contract for a lease of avio of the mine for the term of sixteen years, which term is not yet expired. His agent purchased five shares for him in the City of Mexico, and other shares were also purchased by James A. Forbes. Shares were also purchased by Eobert Walkinshaw and other parties in the City of Mexico and elsewhere. Most or all of the deeds of conveyance, whether executed by the claimant, Castro, .the Messrs. Eobles, or the Padre Eeal, refer to the writing of partnership as the foundation of the title, and none of them make any reference whatever for any purpose to the supposed act of registry, or to the act of juridical possession supposed to have been executed by the Alcalde of San José Guadalupe.
3. Appeal was taken by the United States to the District . Court on the 15th of April, 1856, and from that time to the date of the ¿nal decree the case was pending in that Court.’ Seasons for the appeal, as assigned by the United States, are that the claim is invalid, and that is the principal question that remains to be considered. ■ Written notice was served upon the claimant by the District Attorney of the United States on the 18th day of August, 1856, to produce the original paper of which Exhibit A is a copy, to be used in the examination of witnesses. Exhibit A comprisés the documents filed with the petition as copies of originals on file in the proper .office of the Alcalde Claimant acc ■'rdingly. produced the document which is the one denominated Exhibit E, No. 2, in the record. Eecurring to the *175 document it will be seen tbat while it has all tbe certificates appended to it which are described in tbe copies filed witb the petition, still it shows to a demonstration tbat tbe copies were neither faithful' nor to tbe letter, as was well said by tbe District Judge when bis attention was first calledHo tbe subject. Certificate of James W. Weekes is one of tbe number of certificates appended to tbe document. . When produced it was shown to him while be was under examination as a witness, and upon being asked whether be bad ever seen tbe paper before, be answered tbat be bad, and tbat tbe signature tó tbe certificate was bis signature. At first be seemed to suppose tbat it was a copy of what remained in tbe archives at tbat time, but immediately stated that be himself recorded it in tbe book of registry, and tbat be received tbe document which be so recorded from James Alexander Forbes. He was appointed Alcalde in 1848, and be expressly states tbat tbe person before named brought tbe paper to him and requested‘him to record it, and tbat he did so while be was Alcalde. Original document was presented ‘to tbe witness, as be’ states, by J. A. Forbes, and tbe copy was also made by him, showing tbat tbe witness not only made tbe record without any other knowledge of tbe paper than what he received from bis employer, but tbat be also signed the certificate certifying tbat it was “ a faithful copy made to tbe letter from its original,” without ever having compared it witb tbe paper presented, and when in point of fact it was not a true copy. Examination of James W. Weekes took place on tbe 18th of August, 1857, and on tbe 14th of December, in tbe same year, James Alexander Forbes was also examined by the United States upon the same subject. His testimony fully confirmed tbe statements of James W. Weekes tbat tbe copy was made on the 20th day of January, 1848, and that tbe certificate of. tbe Alcalde, as well as tbe body of tbe instrument, were in bis owe. bandwriting, showing tbat all tbe Alcalde bad to do in the matter was to affix bis signature to a paper already prepared. Witness last named thinks be prepared tbe copy at tbe mine; and be states positively tbat be obtained tbe paper which be used as tbe original from Alexander Forbes who was then at *176 tbe mine. Pressed to explain where he got certain words appearing on tbe first page of tbe document, be frankly admitted tbat be did not know, andj finally stated tbat be copied tbe paper tbat was banded to bim by bis namesake and associate in that business. Attempts were made to impeach tbis witness, but his material statements are so fully confirmed tbat it is unnecessary to reproduce tbe evidence in tbat behalf. Unmistakable proof therefore is exhibited tbat tbe adjudication of tbe Commissioners was based upon documents which were . fabricated, and it follows as a necessary consequence tbat tbe claimant, when be filed bis petition, did not comply with tbe provision of law which required bim to present to tbe Commissioners tbe documentary evidences relied on by bim in support of bis claim. Those papers, strictly speaking, are denominated tbe registry, tbe act of juridical possession and tbe writing of partnership, but tbe counsel at tbe bar have treated tbe entire document as an espediente, and as tbat is a convenient designation, it will be adopted in tbis investigation.
4. Espediente No- 1, called by tbe Attorney-General tbe Weekes’ espediente, must be rejected as invalid. Certain characteristics of tbe paper, however, should be noted in addition to those already- mentioned, in order tbat tbe other documents subsequently introduced may be compared with it as a test of their verity. Caption and indorsement as translated are “ year 1845. Espediente of tbe denouncement, possession, and partnership of the quicksilver mine called Santa Clara, jurisdiction San José Gaudalupe, in upper California.” Contents are: 1. Petition of claimant announcing the- discovery of a silver mine with. ley of gold. 2. Supplementary petition stating that besides silver and gold be bad taken out- liquid quicksilver. 3. Act of pos session signed by Antonio M:-Pico. 4. Receipt of same for fees amounting to $25. 5. Writing of partnership. ' Date of act of possession is Juzgado of San José Gaudalupe, December 30, 1845. Articles of partnership are for a mine of silver, gold and quicksilver, and are dated on tbe 2d-day of November, 1846, some twenty-five days before quicksilver was discovered.
Noting these characteristics as proper to be considered in *177 connection with those previously mentioned, we dismiss the document as wholly unworthy of credit.
5. Second espediente, called the Fernandez espediente by the Attorney-General, is the one introduced by the claimant on the 6th day of November, 1857, when José Fernandez was examined a second time as a witness. His first examination was on the 28th day of March, 1855, while the case was pending before the Commissioners. No such espediente was exhibited then, and no inquiries were made of the witness upon the subject. Request was made of the witness on this last occasion to look at the- document shown him by 'the' 'claimant and say whether he ' •knéw in whose -handwriting it was, and whether the signatures' of Pedro Chabolla or Cbaboya appearing thereon were genuine. Answer of witness was, that the document was in the hand. writing of Salvió Pácheüo, añd that the respective signatures of Chabolla were genuine. ■ Other docunients were then shown to 'the witness, and updn being asked whether the signatures were genuine, his answer was in the afiirmative. Those documents are as follows: 1. Petition of José'"Castro, dated the 27th day of June, 1846, áddréssed to'the Alcalde of first nomination of the Pueblo of San José de Gaudalupe, iñ which, among other things, he solicits three pertenencias for himself and associates in addition to those previously conceded,'and requests that the petition may be attached to the former espediente. Margin'of that paper contains an order signed Pacheco, and dated Pueblo of San José Gaudalupe, June 29th, 1846, as follows: Let this be included and arohived as the party requests. '2. Claimant’s two petitions in respect to the registry of the- mine. 8. Alcalde’s act of possession, which is dated Juzgado de San José Gaudalupe, December,-, 1845. Signatures to the act of possession are Antonio Ma. Pico with Antonio Suñol and José Noriega as assisting witnesses. Separate certificates of Pedro Cbaboya are appended to each of those papers. Three of the certificates are without date, but the one appended to the act of possession is. dated on the 13th day of August, 1846. Writing of partnership, so called, is wanting in the espediente, which came from /he hands- of the claimant. Although Pedro Chabolla was *178 examined as a witness by the claimant, still no questions were asked him respecting this document. Testimony of Salvio Pacheco shows that the whole body of the instriiment is in his handwriting, but he' omits to state from what he copied it, and Pails to give any explanation upon that subject. He says he is acquainted with the signature of Pedro Chaboya, and that his signatures to his certificates are genuine, but he did not see him sign his name, and does not state how he became acquainted with his handwriting. Signer of. th^ certificate testifies that he could not write, that he could only “paint his name,” and that it was with great difficulty that he, could rpad any kind of writing. Caption of the dopumput is No. 1, and it is endorsed “Diligencias en el Registro)” .which signify that it should be promptly registered. Receipt of -Antonio Ma. Pico, as shown on espediente No. 1, is wholly .granting in this document. Considering that th’^ signer of th^ certificates could not write or read writing, ana has not been.called as a ^witness to verify the document, it is’entitled to very little consideration. Circumstances, however will render it necessary to .recur to this paper again after referring to certain other, documents introduced by the claimant.
6. Espediente No. 8, called by the Attorney-General the Halleck espediente, ip endorsed as filed in the case, on the 30th day of Jscipary,, 1858, but it is certain that testimony respecting it w-a,s introduced at an earlier date. Deputy Recorder of Santa Clara); County was examined by the United States in respect to a similar paper on the 18th day of August, 1857, but insisting upon his right to retain the document, a traced copy of it was made, and on the twenty-ninth day of the same month, the copy was filed in the case by the United States. - On the 23d day of October following, another Deputy Recorder of that County was examined by the claimant in respect to the same or a similar document. Exhibiting a document, entitled “Posesión de la mina Sta. Clara, año de 1845,” he stated that he obtained it from the office of the Recorder. Enquiry was made of him when he went into that office, and whether he did not, in 1852, see there the document-produced. His answers were that he had the entire charge of *179 the office from the fall of 1852 to the summer of 1853, but that he had no recollection of seeing the document there during the first year. Explanations were then given by the witness, in which he stated that the first recollection he had of the document was a few days before the date of the ■ filing on the back of the paper, which is as follows: “Filed February 25th, A. D 1853, at 12 o’clock. A. M. — J. M. Murphy, Recorder, by S. C. Houghton, Deputy,” who is the witness; and he goes on to say that just previous to that time, James A. Forbes called at the office of the Recorder, and after describing the paper, desired to seethe record of it. Search was accordingly made by the witness, but he could find none such there, although he says that he and the applicant searched for it more than a day. What the party was looking for, says the witness, was the record of the paper, and not the paper itself, but they could find nothing of the kind, although the search was thorough and faithful. ■
Unsuccessful though they were at that time, still the desired . document, in the course of a few days, was found there without any further search; for the witness states that some days afteT that, he found the paper in the office, either in the top of his desk or one of its pigeon-holes, and he says that he was surprised that it should be there without his knowing it, but having found it, he kept it safely until the party who inquired for it came, and it was then filed at his request. Attention is called by the claimant to the fact that there was written in pencil on the back of the paper, as follo'ws, “Filed 3 o’clock, P. M., 18 January, 1851 — J. T. Richardson, Recorder, S. C. C.,” but in view of the circumstances which surround the paper the fact referred to cannot have much weight. Pencil marks could be added to the filing quite as easily as the paper itself could be foisted into the pigeon-holes in the desk of the Recorder. Interrogatories were also propounded to H. W. Halleck in respect to that document, and the time when it was deposited in the office of the Recorder of Santa Clara. County:
Speaking of the document, the witness said he thought it to bf the one taken by the Mayor, “ in my presence,” from his office, and transferred to the office of the County Recorder in the *180 winter of 1851, during the session of the Legislature, and he thought in the month of January of that year.
■ Recollection of fitness is • that .he first went to the office of the Recorder for a copy ofr the papers connected with the mine, but was told that the greater portion of the old Alcalde papers were in the office of' the Mayor. Learning that fact, he went to the latter office, where, on overhauling certain old papers in an old desk, he found this one among them. Witness, as he states, only remembers the papers he found there from the general subject-mattér of i1 í contents, as purporting to be an original paper, containing the denouncement and juridical possession of the mine. Document embracing a copy of espediente, number one, was shown to the witness, and he was asked whether it was not a copy of the one he found in the office of the Mayor; to which he answered, that he could not remember whether it contained the same papers as that, more of less. Obviously the recollections of the witness upon the subject are very imperfect and indistinct, and consequently his statements are so qualified and so far short of positive declarations that they can hardly be regarded.as evidence. Indistinct, however, as the recollections cf the witness are, still it is evident that he regards the paper as the original denouncement and juridical possession of the mine, because he says so in answer to the direct interrogatory put to him by the United States, but his opinion in that behalf cannot be' regarded as satisfactory proof of the fact, especially when considered in connection with his previous answers as to his means of knowledge and the state of his recollections.
7. Those interested in the mine could not have believed on the 13th day of December, 1850, that any such original document, or duly authenticated copy thereof, was in the State of California, as is evident from the affidavit of their counsel, signed and sworn to on that day. Suit had been commenced in the County Court, by the widow and heirs of José Reyes Berreyesa, against all of the persons in possession qf the mine, to recover possession of a certain tract of land, including that in which the minervas situ ated. Defendants were Isidoro de la Torre, of Mazatlan; Alexander Forbes, William Barron, and Eustacho Barron, of Tepic, *181 John Parrot, of San Francisco; and James A. Forbes, and Robert Walkinshaw of the County of Santa Clara. Court granted a rule on the 13th of September, 1850, requiring defendants to produce “ certain papers or copies thereof,” to be used in the trial of that cause. Among those specified in the motion were certain papers of a pretended denouncement of the mine in 1845. Papers were not produced, and the affidavit of the counsel was filed to support a motion for a continuance. Affidavit stated to the effect that the original denouncement of the mine of New Almadén, and the act of juridical possession given of the same in the year 1845, were held by parties in Mexico, which had not then been received, although the defendants had exercised all due diligence to procure and produce them.
Referring to the contents of this espediente, it will be seen that it contains: 1. Petition of José Castro, already described. 2. Petitions of claimant. 3. Alcalde’s act of possession.
None of the certificates exhibited in the other espedientes are to be found in this document. Testimony was adduced to show that the several .papers were genuine, and the witnesses most relied on for that purpose were José Castro, Antonio Ma. Pico, together with Antonio Suñol and José Noriega, the two assisting witnesses to the act of possession. Full proof was exhibited that ño one of the papers was written by the person or persons who signed it, and it was satisfactorily shown that each paper was in a handwriting different from all the rest. . Satisfactory proof also was exhibited that the petition of José Castro was in the handwriting-of Benito Diaz, and he testified that he wrote it ire or six months after our conquest of that Department. Writing of partnership, and the receipt of Pico for his fees are both wanting in this document. Caption of the document is: " Posesión de la Mina de Sta. Clara, año de 1845,” and the act of possession is dated Juzgado de San José Guadalupe, December —, 1845.
8. Two inveñtories, purporting to contain a list of documents in the Juzgado of San José, were also introduced. Included in the schedule of the first one, which is dated on the 2,d day of ' Tanuary, 1846 ;s the following: posesión de la Mina de Sta, *182 Clara, a D. Andres Castillero; but tbe second, which is dated on the 10th day of November of the same year, shows ncf. trace of any such paper. Testimony of H. C.'Mel one should also be noticed in this connection, as he was the first clerk of the Alcalde’s Court, under our military occupation. His statement is, that he never saw the document or heard it spoken of, although he had occasion to examine the papers there, one by one, in order to select such as should go to the office of the Recorder from such as he was required to keep as county clerk.
'9. Fourth espediente is the one called the Walkinshaw espediente by the Attorney-General, and is the last of the series introduced by the claimant, as the documentary evidences of his title, to the mine and mining right, or privilege described in his petition. Contents of the espediente are as follows: 1. Petitions of the claimant, as in the first espediente. Appended to each is also a certificate of Pedro Chabolla, dated the 18th of January,' 1846, certifying that the petitions respectively were copies of original's, and each certificate purports to have been signed in the presence of P. Sansevan and Jose Suñol, as assisting witnesses. 3. Pico’s receipt for twenty-five dollárs as fees. Introductory part of the receipt corresponds to that in the first espediente, but he also describes the mine as one “in lands pertaining to Don José Beyes Berreyesa.” Castro’s petition and the • writing of partnership are both wanting, and there is no certificate of Pedro Chabolla appended to the act of possession or any certificate of any kind. Another peculiarity of this document consists in its caption, and as that part of the paper is of con siderable importance in the investigation, it will be given without abbreviation. It is as follows:
“Tear 1845.
*Espediente of the Denouncement, Possession, and Partnership of the Quicksilver Mine called Santa Clara — Jurisdiction of San Josl Guadalupe, in Upper California.
“November 22, 1845. — Don Andres Castillero makes the denouncement of the aforesaid, in the Pueblo of San José Guadalupe, for want of Deputation of Mining and of Judge de letras.
*183 "December .3, 1845. — Writing which the said'Castillero presented, testifying to have taken out quicksilver and other metals, asking that it be annexed to the espediente.
“December 30, 1845. — Act of possession, which, with the assisting witnesses, the Alcalde of the Pueblo of San Jose gave to Don Andres Castillero, of the mine of Santa Clara, because of the time of the notices being completed. <
“ December 30, 1845. — Eeceipt for the fees of the possession, signed by the Judge of San José.
“December .8, 1845. — Writing of partnership for the works of the mine, authorized by the Prefect of the 2d District.”
Partnership of the quicksilver mine is one of the matters enumerated in the title of the caption, and the writing of partnership is one of the documents circumstantially described in the last article of the same. Espediente produced, contains no such paper, and the inference is a very strong one that it has been spoliated by some one having an interest to suppress the missing paper. Description of the paper, as exhibited in the last article of the c'aption, gives the date as of the 8th day of December, 1845, which is a very material variation from the other copies ¿resented in this record. . Discovery that the mineral contained, quicksilver, notwithstanding what is stated in the articlés of partnership, was not made until late in November, 1845,.áftér the claimant returned from Sutter’s Fort. - Articles of partnership, as exhibited in the first espediente, were dated ■ before the quicksilver was discovered, and yet the discovery, as set forth in fhat document, was described as of a mine of silver, gold, and quicksilver, which inconsistency tended strongly to impair confidence in the entire espediente.’ Petition had been pending nearly eight years when this espediente found its way into- this case. First espediente was. filed on the 30th day of September, 1852, and this one was filed on the 17th day of July, 1860. Time enough, certainly, had elapsed to énable a party to examine and ascertain what, if any, contradictions or inconsistencies appeared in his proofs, and to give him an opportunity to employ all proper means to obviate any. such difficulty. Produced, as this document was, at so: late a stage of the litigation, *184 it must be held that tbe burden of proof is upon the party producing it, not only to establish the authenticity of the .paper, but to do so by clear and satisfactory evidence. On the 27th of July, 1860, Pedro Chabolla was examined in respect to this espediente. Inquiry was made of him, whether his signature, and those of the assisting witnesses were genuine, and upon looking at the document, he answered both questions in the affirmative, although he admitted, in the same deposition, that he never learned to write, and that-it was with difficulty that he could “paint his name.” His account of the matter was, that the papers were brought to him from the mine; and he says he signed them- because he was requested to do so; and when asked how he knew the papers were correct, his answer was that he did not examine them, adding that "it was not for me to do that.” One of the assisting witnesses, José Suñol, is dead; but the other, Pedro Sansevan, was examined, and confirms the statements of the preceding witness as to the genuineness of the signatures; but two witnesses examined by the United States, testified, without qualification, that the witness had previously stated to them that he signed the documents in the year 1848, and that they were copies.
Theory of claimant now is, that espediente No. 3 is the original filed in office, and that the espediente under consideration was a duplicate executed at the same time and delivered to the party. Three witnesses, Antonio Ma. Pico, Antonio Suñol, and José Noriega, were recalled and examined to prove that the document was executed in duplicated They stated nothing of the kind in their first examination, nor did 'they do so in their second depositions. When, called for the third time, after the fourth espediente had been discovered and introduced, the witness first, named said that the 'document was signed on the day of its date, and he had no doubt he delivered it to the claimant; but the other two witnesses were less positive, and were only able to say that they supposed the document was signed at its date. Learned counsel admit that the theory in this behalf was started at rather a late stage in the investiga-. tion, but endeavor to excuse the claimant upon the ground that *185 the fact was unknown to his attornies, and that his witnesses did not remember it. Attorneys are certainly without fault, and so are the witnesses, unless they have finally attempted to remember what never occurred, which, from all the circumstances, there is too much reason to fear.
Parties holding large and valuable interests in real éstate are generally careful to secure title papers which are supposed to be correct in form, and their solicitude and vigilance in preserving them are more or less active, according to their importance and the magnitude of the interest involved. Contrary to what might have been expected, as shown by experience, the claimant in this case, and those holding under him lost all the original title papers to the mine, although the espediente, as they allege, had been executed in duplicate, and the mine and mining right or privilege were of incalculable value' and importance. Fortuitous circumstances artistically described in the testimony, led, it seems, according to the theory of the claimant, to the discovery of the third espediente, called by his counsel the original, in the depository where-it belonged, and where every one who made any enquiries upon* the subject must have known that the ' papers of the Alcalde’s office had been deposited.
10. Impressions still prevailed, as the claimant represents, in the minds of those interested in the mine that there was somewhere in existence a duplicate original, but all enquiries and search for it:had proved ineffectual until the time when the fourth espediente was discovered under the extraordinary circumstances detailed in the record. Those circumstances arc well described by the witness, Thomas Bell; and inasmuch as they were even more fortuitous than those under which the third espediente was discovered, it may be well to allow the witness to state them in his own language He was examined on the 17th of July, 1860, the day this last espediente was filed. Witness -says:
■ Some time, about three weeks ago, at the request of Mr. Bill- ■ ings, I was looking for-the documents relating to the barras in the mine of New Almadén, which at one time had belonged to Padre-Real ; not finding one of the documents which I was m search1 *186 of among the papers of the mine, I asked Mr. Young to get the box containing the papers relating to the estate of Walkinshaw to see if it could not be found there. He produced the box, and then we proceeded to overhaul the papers. I saw a bundle marked — “Papers relating to the disputed barra,” which I opened, and in looking over these papers I found one endorsed “ Titles of Mines.” I was struck with the antique appearance of the paper, and knowing that it was suspected that Walkinshaw had had documents relating to the Almadén mine in his possession, after glancing over the papers, I took them to the office of Messrs. Peachy and Billings, to ascertain more particularly their nature. It was then discovered that it was an espediente which they had- been anxious to obtain for a long time.
Explanation of the transaction as given by the claimant is, that Robert Walkinshaw, the undisputed owner-of two shares in the mine, brought suit against Bolton, Barron & Co., to establish his right to a third share claimed by him on which the defend ants refused to pay him dividends. He employed counsel and gave him certain papers which the counsel, who is now one of the counsel in the case, retained in his possession from January, 1858, when he was employed to bring the suit, until May, 1858, when he returned them to his client who gave him a receipt for the papers. Receipt is dated' on the 14th of May, 1858, and the first paper named in it is a document in Spanish, headed “ Ano de 1845, Espediente de denuncio posesión y compañia de la Mina de- Abogue nombrado Santa Clara, jurisdicion de St. José Guadalupe, en la Alta California.” Five pages writing and certificate, endorsed “ Titles of Mine.”
Day after the date of that receipt the party signing it sailed for Scotland, where, in the following August, he died. Document remained among the effects of the deceased in the care of his son-in-law and the executor of his estate until it was brought to notice in the manner already described.
Deposition of the son-in-law, who was the executor of the estate, was also taken by the claimant. He confirmed the statement of the preceding witness, but adds that he had previouslj *187 examined the papers of the deceased in search of documents relating to the title of the Almadén mine without , any such success. Where the box had been kept, and whether so situated as to be accessible to other persons or not, the witness does not state; but he does state that the decedent before he left the country, handed him the documents found in the bundle, and that he enveloped them “ in a piece of paper ” and labelled the envelope.
His search on the former occasion, as the witness admits, was especially , directed to find the testimonio of the act of juridical possession, but he made no such discovery at that time. First search, as in the matter of the third espediente, was unsuccessful, but the second was attended with no difficulty. Such a discovery at that stage of the controversy was doubtless thought to be an acquisition as valuable as it was unexpected, and if the document could be regarded as an 'authentic paper, free from suspicion, the claimant and those holding under him, in one aspect of the case, might well be of the opinion that its importance could hardly be over estimated.
Assuming the other espedientes to be genuine, still the evidence in regard to them, even if viewed according to the theory of the claimant, showed conclusively that article 4, title 6, of the Mining Ordinance had not been complied with, because it was conceded that no attested copy of the proceedings had been delivered to the acquirer of the mine as “ a corresponding title.” When he filed his petition before the Commissioners, he also filed copies of the first espediente. Both the copies and the original, subsequently produced, represented that the act of juridical possession contained the day of the month on which it was executed, and besides the document embraced the receipt of the Alcalde for his fees and two certificates of Pedro Chabolla dated on the 13th of January, 1846, appended to the two petitions of the claimant. Those particulars were all wanting in the respective documents subsequently introduced. Favorable adjudication under such a state of facts could not rationally be expected, unless these glaring inconsistencies could be explained, because their effect was not only to impair all confidence in those doeu *188 merits, but also to. discredit all the witnesses who, under oath, had verified the first espediente and the several papers of which it was composed.'
Mention is made of these circumstances as showing the urgent necessity there was for additional proof and the corresponding inducement to-commit fraud by fabrication and forgery. Counsel of the claimant admit in their brief that from the time James A. Forbes was examined as a witness in relation to the first espediente, until May or June, 1860, it remained inexplicable, whence' ca'me the word thirty in the date of the fir£t, copy of the act of juridical possession, whence came the copy of the receipt of the Alcalde for his fees, and whence came the' copy of the two certificates of Pedro Chabolla which follow the respective petitions of -the claimant. All these were found in thé cop3r produced and. filed as the first espediente, and up to that time had been treated by the claimant as parts of a genuine document. “Whence they came,” say the counsel, “was the mystery,” but their theory is, that the mystery was solved by what they now call the duplicate copy of the act of juridical possession, and in support of the theory they suggest, that it had long been supposed that such a copy must have been deliv- ) ered by the Alcalde to the claimant. Suggestions were also made as to the mode in which Robert Walkinshaw might have become possessed of the supposed original document; but it is a sufficient answer to all these suggestions to say that they are founded on mere conjecture, are not supported by the evidence, and have little or no foundation in the probabilities of the case. Production of that espediente, say the counsel “furnished the means of bringing in the testimony of all the witnesses concerned in (its) preparation who were yet living.” Accordingly those witnesses wño were called for the third time and- reexamined, and although in théir former depositions they had uniformly spoken of the espediente supposed to have been- executed before the Alcalde in the singular number, without any intimation in respect to a duplicate, yet at last, after the petition had been pending nearly eight years, they were, as they state, able to recollect that a duplicate was executed at the same time *189 and delivered to the claimant, but tbeir recollections upon tbe subject are by no means as distinct as tbé'y ‘wére on a former occasion tbey testified to the effect that the first espediente was a genuine document. Sucb testimony under';tbé Circumstances, is not entitled to credit, and sucb theories as’ those set up in respect to tbe supposed existence, loss 'áhd -discovery of tbe third and fourth espedientes as genuine origihal documents are too speculative, sound too much in fiction, áhd are too thoroughly saturated with improbability to receive credence in a Court of Justice.
11. Frequent reference is made by tbe claimant in this connection to tbe evidence adduced as .to tbe proceedings of tbe Junta de Fomento and other Departments of the ^ Supreme Government, as tending to confirm tbe testimony introduced to prove tbe genuineness of these documents, and it may'be conceded that tbe evidence referred to has some indirect-bearing in that direction, but it must be- borne in mind that no one of those documents," nor any part thereof, was ever submitted to those Departments, or to any one of them, and it is by no means certain that tbe officers of those Departments, or any one of them, ever beard that any sucb documents bad -been executed. Tbey bad doubtless beard -what tbe claimant bad stated in bis communication to tbe Junta de Fomento, but there is no evidence to show that tbey bad ever beard any thing more than -that in respect to any of the supposed proceedings of tbe local authorities upon that subject. None of tbe documents were presented to them by tbe claimant, and of course there could have been no action in respect to tbeir genuineness, which is tbe question now under consideration. Arguments which confound the question as totbe genuineness, of tbe documents, supposed to have been executed before tbe Alcalde, with tbe. question of confirmation by tbe Home Government, afford very little aid in tbe decision of tbe case, and, in point of fact, are entitled to no weight, because tbeir effect, if any, is to mislead.
Strong, however, as oür impressions - are that tbe evidence fails to show that any one of tbe four espedientes, introduced by tbe claimant, is entitled to credit,- still we are disinclined, in view *190 of the great complication of the evidence upon the subject, to rest the decision of the case upon that ground.
YI. Two other principal objections are made to the confirmation of the claim;
First. It is insisted by the United States, that it is not shown by competent evidence, that a public tribunal, empowered by law to take jurisdiction over the subject-matter of the acquisition of a mine, or mining right, dr privilege, has ever acted in this case, and, adjudicated to the claimant the title to the mine, as alleged by him in the petition.
Secondly. That if such a tribunal is shown by competent evidence to have taken any action in the case, still it does not exercise its special and limited jurisdiction in á manner required by law so as to constitute or evidence any title to the mine claimed by the petitioner.
1. Mines under Mexican laws, as before explained, whether situated in public or private lands, belong to the Supreme Government, and private persons can only acquire a title in one not previously discovered and made individual property according to law, by conforming substantially to the conditions ordained in the provisions of the 4th article of the mining ordinance as herein previously recited. Applicant must resort to the proper tribunal and present his written statement, specifying in it his name and the names of his partners, if he has any, the place of their birth, their residence, profession and employment, and the most particular and distinguishing features of the place, hill or vein, of which he asks adjudication. The title to such properties are acquired by the citizen or subject wherever Spanish law prevails by the adjudication of the proper tribunal having jurisdiction of the subject-matter. Contrary to what 'is supposed by the claimant, is the adjudication, or decree, of the proper tribunal in a case duly presented for decision, and the registry of the adjudication together with the proceedings on which it is founded, which vest the title in the applicant, and not the mere fact of discovery as was supposed at the argument. Without proof of discovery by the applicant, there can be no adjudication in his favor, but tbe discovery of a mine, by a party in whose favor there has been' *191 no adjúdítion by a tribunal having jurisdiction of the subject-matter, secures no right or title to the discoverer. Boundaries also must be fixed to carry the adjudication into effect or rather to complete it, else the title or claim, like other indefinite and uncertain interests in lands, will be void for uncertainty. Marking of boundaries also is essential under all 'circumstances, whether the mine is situated in public or private lands, for if the location is in public lands, comphance with the requirement is essential to show what extent of the public domain has been segregated from the mass of such lands and has passed into private ownership.
2. Public convenience, therefore, in such a case requires that the boundaries should be fixed, and, besides, unless the limits of the pertenencia were fixed and staked, or monuments set, other tribunals, whose duty it is to adjudicate lands to applicants for agricultural purposes, would be subjected to embarrassment and be led into error. Definite limits also to mining rights or privileges are equally necessary and important, where the same happen to be located upon the lands of private individuals, in order that the land owner, as contradistinguished from the owner of the mine, may have the means of knowing and be judicially notified, as to what portion of his land has been condemned and appropriated to the use of another.
3. Registry, also, is expressly required by the very article of the mining ordinance under which the party in this case claims title to the mine, and it is a great error to suppose that a compliance with that provision is shown by proving that sheets of paper, not executed at the same time, but assumed to constitute an espediente, were at some time placed in the' office of the Alcalde and remained there for a time in one of the pigeonholes of his desk. Such a suggestion is destitute of any foundation. On the contrary, the requirement is in express terms that the statement of the discoverer; together with the time when he presented hin.self, “shall he noted in a hook of registry, which the deputation and notary, if there be one, shall keep, and in respect to the action of the tribunal on the application, the provision is that an exact aocount shall be taken ” in order that it mav be *192 added to the corresponding part of the registry with the evidence of possession, which shall immediately be given. Act of possession, therefore, is .to-:be added to the registry, together with the action of the tribunal on making the adjudication,- unci'they are both required to be noted in a book (Libro) of registry.
4. Strict compliance with that provision is required as matter of public policy, because the mines of a country like Mexico are a great sources of .revenue to the Government, and because it tends to prevent disputes and litigation; prevent fraud and false swearing; secure such rights of property, and promote order and a good understanding among miners holding and working contiguous pertenencias. 1 Gamboa per H., pp. 143, 144.
The tribunal empowered by the mining ordinance to exercise this jurisdiction was “the Deputation of Mining” for the territory or district where the mine was situated, or the nearest one thereto, should there be none there. Halleck Coll. 224. Former ordinances, especially that of 1584, on which Gamboa wrote, conferred the power of adjudicating such titles exclusively on the Mining Court within whose jurisdiction the mine was situated. Ord. 1584, art. 17, Gamboa per EL, 139. Section 17th of that Ordinance also provided “ that in case such registry be not made in the manner, and within the prescribed time, any person may' register such mine, and shall thereby have and acquire the right which such discoverer or other person who might have required the registry, would, have had if he had caused the registry to be made.” Gamboa, p. 141.
• 5. Cases occurred under that Ordinance where mines were discovered in districts having no Mining Court, and in that state of the case there was no tribunal in the parent country which had jurisdiction of the subject-matter, and of course the matter had to be referred .to the sovereign'power, and to remedy the embarrassment arising -under such circumstances from the want of a court to adjudicate such titles, it was provided, in the mining Ordinance of 1783, that the court “nearest thereto” should have jurisdiction of such á case. ’ Parties concede that the ordinance last named was in force at the date of these proceedings, and unless it. can be shown; (and the burden is upon him who avers *193 it,) that the provision referred to has been modified or .repealed, it is clearly applicable to this case. Constitution of Mexico vested all the judicial powers of the Republic in one Supreme Court of Justice, and other courts and tribunals to be constituted in conformity to the instrument. Coll. Mexican Constitution; tomo 1, titulo 5, art. 123. Pursuant to that provision the Tri; bunal-General of Mining, on the 20th of May, 1826, was deprived- ■ of its powers. -New regulations were then adopted, which were from time to time amended, but it is not important to notice those decrees, because on the 2d day of December, 1842, a new system, carefully digested, was put in force, the 4th article of which constituted and regulated the tribunals of mining. • Halleck Coll., pp. 409, 424, 434, 441.
Among other things it provides for the creation of. “ Courts of the First Instance ’’ in each Department, and for the mode of the r election, and also provides that those courts, within their respe; tive districts, shall exercise the executive, judicial, and econorr ¡ cal powers given by the old ordinance. Halleck Coll. p. 441 title 4, art. 26.
6. Courts of the First Instance were never organized in the Department of California, and the argument of the claimant is, that in consequence of that fact the ordinary tribunals, as for example, an Alcalde could take jurisdiction over su,ch. a subject-matter, and on the .application of the discoverer, could adjudicate the title. But the position cannot be sustained, because by the express law of the Republic, as evidence in the special decree ■ ■ of the 14th of January, 1843, it is provided that territorial deputations may continue to exercise their functions “ until the Courts of First Instance * * are established.” Halleck Coll., p..443. Support to the positioh cannot be derived, as is supposed, from the fact that the law was'so in some of the dependencies of Spain prior to 1783, because it is from the express terms of the Ordinance of that year that the Mining Deputation derived their exclusive jurisdiction .over the subject, and inasmuch as the supposed analogy on which the position was based fails, the. position must fall with it.
7. Mexican policy also, and administration in regard’to that *194 Department, afford strong ground to conclude that no such power was intended to be conferred upon any of the officers of' the Local Government. Those officers were a Governor, appointed by the Supreme Government, a Departmental Assembly, consisting or seven members, who were chosen by electors,' but their election was subject to the approval of the Home Government.
Most of the important functions of the Local Government were performed by the Governor and the Departmental Assembly , but the law also made provision for the appointment of Prefects, who were to be nominated by the Governor and confirmed by the General Government; also, Sub-Prefects, who were to be nominated by the Prefects and approved by the Governor. Provision was also made for Ayuntamientos or Municipal Councils, whose ordinary members were elective; and also for the appointment of Alcaldes and Juaces de Paz or Justices of the Peace, whose numbers were to be fixed “ by the Departmental Assembly, in concurrence with the Governor.”' Arrillaga, Recop., pp. 202, 214, 223, 230. Judicial functions were exercised by the Prefect as well as the Alcalde, and no reason is perceived for holding that the latter could adjudicate a mining title which might not be adduced with equal and even greater force to show that the same important duty might be performed by the Prefect; but the truth is, there was no law which gave either the one or the other any pretence of jurisdiction in any such matter Theory of claimant is, and so is the argument, that the jurisdiction must have been confided to some of the officers of the-Department, and that the presumption is, that the Alcalde had jurisdiction, inasmuch as it is not shown that Courts of First Instance had been constituted and organized.
Giving the argument, however, its utmost force, it only'shows that a law conferring upon an Alcalde such a jurisdiction would have been a convenience to the inhabitants, and especially to the claimant; but it has no tendency to show there was any such law, which is the question to be decided. Opinion is expressed by two or three of claimant’s witnesses that an Alcalde might make such an adjudication, but they exhibit no law to that effect, nor do they attempt to prove there was any'such general *195 usage; and inasmuch as their opinions are not competent evidence, their testimony may oe dismissed without further remark. Authorities of Mexico had long dreaded the influence of foreigners in that Department, and although the policy of the Home Government was to promote”the settlement and growth of, the Department, still they had always manifested an unwillingness to confer any more power upon the Local Government than was necessary to accomplish those objects.
Mineral wealth, if discovered, would furnish a motive to attempt the conquest of the Department, and it may well be inferred that the authorities of the Home Government had determined to reserve the adjudication of titles to such important public interests to the Federal tribunals. Strong support to that view of the case is derived from thé course pursued by those authorities when the land system of the Department was devised and put into operation.
'8. Power to grant vacant lands was as early as the 18th of August, 1824, vested in the Governor, in concurrence with the Departmental Assembly. Additional regulations upon' the subject were adopted on the 21st of November, 1828, which exhibit a system as complete and perfect as is to be found anywhere. Granting vacant lands for agricultural purposes was by n<5 means regarded as a matter of so much public importance, as the adjudication of titles to newly discovered mines. Those provisions and regulations confer very ample power upon the Governor' to grant vacant lands in, concurrence with the Departmental Assembly, but they confer no power upon them or upon any of the local authorities to, adjudicate titles to mines. Grants of land made under those laws did not convey to the grantee the unsevered minerals in the soil or any interest in them, and-there is no ground whatever to hold that the Supreme Government ever conferred upon any of the local tribunals any jurisdiction upon the subject under consideration. Authority of- the Alcalde; therefore, cannot be inferred from the fact of its exercise, or from the fact that no other tribunal of the Department was- -antho rized to exercise such a jurisdiction.
VII. But if the Alcalde bad power to take jurisdiction of the *196 subject-matter, still it is insisted by tbe United States in the second place that he had only a special and limited authority, and that he did not exercise it in the manner required by law. 1. His proceedings were based upon the written statement of the claimant, and that was upon its face exceedingly imperfect if not absolutely insufficient. Some of the provisions of the mining ordinance are doubtless merely directory, others may be regarded as conditions subsequent, but'those appertaining to the registry of the mine, together with the action of the tribunal thereon, and in respect to the juridical possession of the same, are evidently conditions precedent; so that it is necessary, in order to support a title to such a right or privilege as a discoverer, to show that the party substantially performed those conditions. Unless a claimant shows a substantial compliance with those requirements the conclusion is inevitable, not that he has forfeited his right, to the mine, but that he never acquired ' any such title. Forfeiture is of that which a party hath, but he cannot be said to have forfeited what he never had acquired, as the title to that which he had never acquired, must always have been in the State or in another person.
2. Nothing like forfeiture is pretended by the United States, and no such question arisés in the case; but the proposition is, that the claimant never acquired any right or privilege in the mine even if he was the discoverer, because he did not, as required by law, pursue the necessary steps to give vitality to the inchoate privilege or pre-emption accorded to the discoverer to proceed according to law, and ripen such privilege or pre-emption' into a perfect or complete right by a registry of that which he had discovered before the proper tribunal, and by securing ' the juridical' possession of the same under a legal adjudication of the title, gis discovery, and its registration, as is well said by the. counsel\>f the United States, gave him a. right, within ninety days-to make an opening into the vein, and the further right to apply to the proper public authority and have that which he- claimed to have discovered defined and set out to him, and its boundaries marked,- and a record made of his title to the defined pertenencias. When all this is done according to law, *197 the inchoate privilege or pre-emption of. a discoverer so to proceed is then ripened into a perfect or complete right, and his title to the mine comes into existence.
3. Returning to the written statement which in this case is the petition of the claimant addressed to the Alcalde, and noting the representations it contains, it is clear that it is not a compliance with the requirements of the ordinance in many respects. . Ordinance, for example, requires a written statement of the most particular and distinguishing features of the place, hill, or vein of which adjudication is asked, or of which he asks the grant, as the phrase is rendered in some of the translations. Representation in the statement or petition is, that he, the' claimant, has discovered a vein of silver with a ley of gold “ on the rancho of José Reyes Berreyesa, which was a hacienda of a league square, mostly table,land, with disputed boundaries.” Another require-' ment of the ordinance is, that the applicant shall give “the names of his partners, if he has any, and the place of their birth, their residence, profession, and employment;” and by article 6, óf title 7, the discoverer is expressly forbidden to denounce a mine for himself having entered into a contract of partnership, and yet the claimant’s petition which shows that there was a partnership, fails to disclose the names of his partners or any of the required particulars, and it also shows that he denounced the mine to himself alone. .
4. Strong doubts are entertained whether the Alcalde, even if he had jurisdiction of the subject-matter, was authorized to proceed and adjudicate the title upon the basis of such a statement; but it is not necessary to decide that question, as there are two other defects in the proceedings which are fatal to the pretensions of the claimant. No such registry of the particulars concerning the mine, or of the action of the Alcalde upon the allegations of the petition, or of his proceedings in respect to the juridical possession of the mine was ever made, as is required by the provisions of the ordinance, nor were the pertenencias measured or definitely located, or the boundaries fixed, or the stakes set, as is therein required. Registry has been required ns the basis of the title to a mine wherever Spanish law has pre . *198 vailed for more than three centuries, and probably no case ever occurred within that period which more fully showed the absolute necessity for such a rule or more fully exemplified its wisdom than the case under consideration.
Whon the Alcalde was first called and examined in another suit concerning the proceedings before him, in respect to the registry of this mine, and the supposed juridical possession given of the same, he testified that the claimant applied to him to go and give him possession of the mine, according to the Mexican custom. Taking the account óf the matter, as he then gave it, to be true, he went there with the claimant and others, and pointed out such boundaries as he thought the claimant ought to have; but he expressly stated, on that occasion, “ that no fixed possession was given to him,” for the reason that there was a dispute between him and José Beyes Berreyesa, on whose rancho the mine was situated.
Berreyesa, as the witness stated, would not consent that possession should be given unless the claimant would admit that be, Berreyesa, should have an interest in the mine, and as the claimant would not do that, he, the witness, did not give any fixed possession of the mine. Witness was three times examined in this case, and- on two of the occasions, he was interrogated upon this subject. His statements are'to the effect that he, with the claimant. and others, went to .¿the mine; that after they arrived there, he sent for José Beyes Berreyesa, the proprietor of the Bancho, and that he accordingly came to the mine; that he, the witness, made known to- Berreyesa what it was that was proposed to be done; that.at first he objected, but finally consented, and that he, the witness, delivered the possession to the claimant. They made no survey, fixed no boundaries, and set no stakes, and the witness expressly states that he had no idea whether the three thousand varas in all directions were to be laid out in a square or round; that a part of the tract only was to be located around the mine, and the residue on the public domain in that neighborhood.
6. Nothing was done on the land; and if the witness is to be believed, very little was said, except that he stated that he *199 delivered the three thousand varas in all directions to the claim ant. During the examination' he was reminded of his former statements upon that subject, and was requested to explain the differences, but his answer was that, according to his understanding, there was no contradiction between his testimony then given and the statement in the act of possession. Alcalde Antonio M*- Pico had a secretary by the name of José Fernandez, who. was a witness in this case, and who was also the escribano of the Court, but the Padre Real expressed a wish that these documents, whatever they were, should be prepared by one Gutierrez, a teacher at the Mission of Santa Clara, which was a league or two .from'the Juzgado of San José Guadalupe. They were not, therefore, prepared by the Secretary of the Court, and a]j he knowá upon the subject is, that two or three days after the party returned from the minie, the schoolmaster, Gutierrez, brought him the' document, and said, “ there, now, it is all finished, and here is your fee,” giving him three dollars and a half, and “ so,” in the language, of the witness, “ the document remained in the Court,” but'" he expressly states that he never read it, or examined it and when asked by the United States what he did with it, he answered: “It remained there in Court.. I did nothing else .with it.”
Other witnesses were examined upon these topics, but the statement given contains the substance of the evidence on both; and all the witnesses agree that there was no survey, no stakes set, and no boundaries marked many manner. On this state of the case, it is insisted by the United States, that the acts of the Alcalde were absolutely void, but the claimant insists that even conceding the irregularities to 'have been such as represented, still that the acts of the Alcalde were not absolutely void, but at most only voidable, and' that they were, afterwards ratified and confirmed by the Supreme Government.
7. Reliance, it is proper to remark, is placed by the' claimant upon the eVidence of ra ification, as affording a sufficient and complete answer to all the objections taken to the claim made by him to the mine. Examination of that evidence, as exhibited in the copies of documents, introduced as true copies h original» *200 on file in the Departments of the Supreme Government, has already been so fully made that a brief reference to it in this stage of the investigation will be sufficient.
Statement of the claimant in his communication to the Junta de Fomento is, that he had discovered a mine of quicksilver in the Mission of Santa Clara; that he had denounced and taken possession, not only.of the mine, but also of an extent of three thousand varas in all directions, that he had formed a company to work it, had constructed the pit, and had complied with all the conditions' prescribed by the ordinance. Required, as he was, to make the representation in writing, it was of course prepared with deliberation; and yet he falsely states that the mine is situated "in the Mission of Santa Clara,” and suppresses altogether the fact stated in his petition, and repeated in the act of possession, that the mine was situated on the rancho of José Reyes Berreyesa.
He refers to none of the documents, and none were produced, and this remark applies as well to his seventh proposition as to his representations'in the preliminary part of his communication to the Junta. They adopted his seventh proposition, and recommended to the President, through the Minister of Justice, that, the possession given to the claimant by the local authorities, as he represented, should be confirmed. Two- accounts are given, as- to what was the action of the President on the occasion. First, in the dispatch of the Minister of Justice, and secondly, in that of the Minister of Relations.
In the’ first, the language is, that the President “ has been pleased to approve in all its parts the agreement made with (the claimant) in order to commence the working of said mineand in the sécond, the language is the same, except that the purpose of the agreement, as described, was “ to commence the exploration of that mine'' Neither the one or the other contains a word which, by any proper construction, can be held to confirm the acts of the local authorities, or any of them, or to vest in the claimant any right, title, or interest in the mine. None of the documents, executed by the Alcalde were before the President, and it does not appear that be ever heard of them in any other *201 manner than by those vague representations, or others of a similar character. Action of the President evinces caution and circumspection, and the several communications, taken together clearly show that he did not act at all upon the seventh proposition of the claimant, or upon his representations in respect to the juridical possession of the mine; and there is nothing in the marginal order in any respect inconsistent with this view of the case, as it is evident that the purpose and intent of that order was accomplished in the contemporaneous dispatch of the Minister of Justice. Credence was evidently given to the .representations that a mine had been discovered, and the President was. willing that an advance of $5,000 or $6,000 should be made to thé claimant to enable) him to commence its exploration. Directions were accordingly given to approve the agreement to that extent, and to make the advance and furnish the retorts and other apparatus therein mentioned.
8. Second grants of land in the Department of California were seldom made by the Governors, and as the claimant already had one, he could hardly expect to obtain another without the special approbation of the Supreme Government. Hence his.' eighth proposition that a grant should be made to him, ■' as a colonist,” which was approved by the President so far as appears in the dispatch of the Minister of Relations already explained. Grants of that description conveyed no interest in the minerals, as was well known to the claimant; and in respect to the eighth proposition, the .President was silent, evidently reserving that matter for further information and a more deliberate consideration. Irrespective, therefore, of the question of fraud, we are of the opinion that, by the true construction of the several communications,.the claimant fails ..to show that the acts of the Alcalde have in any manner been ratified or confirmed by the Supreme Government.
It is clear, therefore, that the respective documents executed before the Alcalde must stand or fall, by what appears in the instruments, when considered in connection with the evidence, showing what was lone at the time of their execution. Conceding fall, cj edit to the vitnesses, and giving the utmost scope to theii *202 testimony- consistent with the language employed, still it is obvious from the claimant’s own showing that he never made any registry of the mine, within the meaning of the provision requiring it to be made. Such a document cannot be said to have been registered/ merely because it was handed to the Secretary of the Alcalde, before whom it was executed, and was for a time somewhere in the courthouse,‘ especially when it appears that it was subsequently abstracted from the depository, if such it may be called, and was’ not returned to it • for years afterwards, and then clandestinely and under circumstances of the greatest suspicion. -Constrained as we are to regard-the facts in point of view, the conclusion is inevitable that there was no legal registry of the mine, and the evidence is all one way to show that there was no survey of the nine hundred pertenencias granted, and no boundaries were fixed, and no stakes were set as required in the ordinance. Assuming, therefore, that the Alcalde had jurisdiction over the subject-matter, -still, as it was but a special-and limited authority, in order -to give any validity to his acts he must exercise it in the manner required by law, and not having done so, his acts are void.. U. S. vs. Osio, 23 How., p. 283; U. S. vs. Castillero, 23 How., p. 466.
VIII. Conduct of claimant throughout shows that he knew that he had no title as is plainly to be inferred from the fact that in the several conveyances made by him he never referred to the registry of the mine or to the acts of juridical possession supposed to have been executed before the Alcalde as the source or foundation of his title.
1. Whenever he referred .to the source of his title he uniformly pointed to the writing of partnership, Sale of five barras •or shares of the mine was on the 17th day of' December, 1846 made by the claimant to Alexander Forbes, of Tepic.
2. Negotiations for the purchase and sale commenced on the -5th of the same month between the claimant and Francisco M. Negrete, the agent of the purchaser. Several interviews took place, but the negotiations were suspended to await the arrival of the Padre Ugenio McNamara, the agent of José Castro; He arrived from Tepic a short time before the contract of sale was *203 completed, and Negrete testifies that up to that time he had seen no other-document than the writing‘of partnership, and no other had been mentioned. Padre McNamara brought with him the contract of lease or avio, which had been concluded between-him, as the agent of José Castro, and Alexander Forbes.
3. Claimant approved the contract of avio, voluntarily putting into it his claim to the two square leagues of land-. At the same time, also, he executed the conveyance of the five shares to the purchaser, but in none of these transactions was any mention made of the registry of the mine or of the act of juridical possession, leaving it to be inferred that the writing of partnership was the only document ever executed before the Alcalde, or certainly that there was no other, that the claimant thought proper to exhibit to a purchaser.
IX. Much stronger evidence, however, is exhibited in the record to show that the parties most interested in the mine, and who were engaged in working it, knew full well that the supposed title was invalid, as is fully shown by the correspondence between James A. Forbes and Alexander Forbes, or between the former and BaTron Forbes & Company. More than forty letters between these parties are exhibited in the record.
Brief references will }>e made to such as have the most direct bearing upon the question under consideration, omitting all such parts as are not material to the inquiry, but preserving the substance. 1. Under date of the 5th May, 1847, James A. Forbes suggests to William Forbes, but evidently in reply to letters received from Alexander Forbes, that it is of the most vital importance to obtain from Mexico a positive, formal and unconditional grant of the two sitios of land conceded to the claimant according to the decree appended to the contract, and also an unqualified ratification pf 'the juiNical possession which.was given of the mine by the local authorities, including, if possible, the three thousand varas of land given in,that possession as a gratification to the discoverer. He also suggests' in the same letter that the documents should be made out in the name of‘the claimant and his partners.
2 No letter is produced which is a direct reply to that com *204 munication. Record shows that Alexander Eorbes visited California early in October, 1847, and it appears that he remained there until near the close ,of March, 1848, engaged, at least for a part of the time, in exploring the mine and in overseeing the. prudential affairs of the Company. ' During that 1 eriod other persons acquired an interest in the mine, and among the number were Barron, Forbes & Company, and they accordingly wrote to James A. Forbes, under date of the 11th of April, 1849, informing him that hereafter he might expect that the mine would be worked to the utmost of its capabilities of production. On the 20th of May, 1849, they wrote another letter to the same individual, saying in effect that from certain circumstances that he had mentioned it might be necessary to purchase some lands in the vicinity of the mine and hacienda of New Almadén, and authorized him to make such purchases, not to exceed in price the sum of $5000, as might be necessary to the secure possession of the mine and hacienda, or to effect such other arrangements as he might deem necessary for that purpose.
8. Seven days after the date of that letter, and before it was received, James A. Forbes arrived at Tepic, and while there left with Alexander Forbes the folllowing memorandum to be delivered to the claimant: “Very private.” Memorandum of the documents which Don Andres Castillero will have to procure in Mexico.
“ 1st. The full approbation and ratification by the Supreme . Government of all the acts of the Alcalde of the District of San . José, in Upper California — in the possession given by the said /officers of the quicksilver mine situated in his jurisdiction, to Don Andres Castillero, in December, 1845.
“2d. An absolute and unconditional title of two leagues of land to Don Andres Castillero, specifying the following boundaries : — On the north by the lands of the Rancho of- San Vicente and Los Capitancillos; on the east, south, and west by vacant lands or vacant highlands.
" 3d. The dates of these documents will have to be arranged oy Don Andres, the testimony of them taken in due form, and *205 besides, certified to by tbe American Minister in Mexico, and transmitted to California as soon as possible.
“Tepic, May 27, 1849.”
Proofs in the case show that the author of that memorandum returned to San Francisco, and on the 28th day of October following, in a letter to William Forbes, he again called his attention to the importance of his former suggestions as to the necessity of perfecting the title to the mine. In that letter he also referred to verbal explanations~previously given by him to his correspondent and Alexander Forbes, and then proceeds to impress upon the mina of his correspondent the vast importance of securing from Mexico the documents comprised in the memorandum left with Alexander Forbes, when he was m Tepic, for the claimant. Two days afterwards he wrote again to Alexander Forbes, in which letter, among other things, he says to his correspondent, you will now readily perceive the great importance of my advice to you to purchase a part both of the lands of Cook and of the Berreyesas. You were of the opinion that this measure would not be necessary in view of the supposed facility of getting the title to the mine perfected in Mexico, and he complains that more than five months have elapsed since it was decided that the claimant should procure the necessary documents in that city, and that they have not been sent to him.
4. His description of his situation shows plainly that he was in great, want of the documents, because he says that on the one side he depended upon the precarious and illegal possession of the mine granted by the Alcalde of the District to the claimant, who was himself in reality the judge of the quantity of land given by the Alcalde; and on the other side, he says he was attacked by the purchasers of-the same J.and declared by the claimant himself to comprise the mine. Evidently that letter was regarded as one of importance, for it called forth two replies, one from Barron, Forbes & Co., and one from Alexander Forbes. By the one first mentioned, he was informed b/ his correspondent that on the 13th of the same month they had enclosed to him á notarial, copy of the grant of land made by the Mexican Govern ment to the claimant.
*206 They acknowledged therein the receipt of his letters, thanked him for his able conduct, expressed satisfaction in view of the document sent, that he had not been obliged to purchase the land of Berreyesa, but submitted the matter to his best judgment, requesting him, however, to keep in view, “ that at all hazard, and at whatever cost, the property of the mine must be secured,” adding, " Castillero, we expect, will soon be here from Lower California, and if anything can be done in Mexico, he is the fittest person to procure what may be wanted.” Recurring to the other letter, it will be seen that it was more guarded, but the writer recommends that his correspondent and agent' should proceed, without fear of disapproval, or waiting for instructions, in taking such measures as shall preserve this valuable “ negotiacion” from any risk from those unprincipled claimants who have lately given him so much trouble, or from any other proceedings that may take place.
5. Another letter, also, was written by Alexander Forbes to James A. Forbes, under date of the 1st of December, 1849, in which he stated that the copy of the grant of land made to the claimant was, by mistake, not the one meant to be sent; and he explains the difference, which was, that the one sent was directed át the foot to the Governor, but the proper one was directed to the claimant, and was. deposited at .Monterey. Explanation is also given as to the difference in the legal effect between the two documents, which was, as explained, that by the first one the delivery by the Governor was perhaps necessary, whereas the other, being addressed directly to the claimant, did not require that formality,, nor was any other proceeding necessary, thus making it,, as the writer affirmed, a better document than the greater part of the other titles for lands in that Department.
Having made these explanations, he then expressed the hope that the well known cleverness of his correspondent had already enabled him to. find out the mistake; suggesting, but rather doubtingly, that the one previously sent should be withdrawn, and the second one substituted in its place; but presently, as if upon reflection, mentions another difficulty which might arise, and that was fh«t the copy of the grant of the two sitios of land *207 inserted in the contract-of lease or avio was also directed to .the Governor, and in view of that fact he finally decided to send a copy of all the documents and leave it to the good judgment of his correspondent to make such use of them as he should think proper. ' Nothing need be remarked respecting the copy of the document last sent, except to say that if it was addressed to the claimant it was a forgery, as the whole evidence shows that but one dispatch upon the subject was ever issued by the Minister of Eelations, and that was directed to the Governor.
6. Eeference will next be made to another letter from Alexander Forbes under date of the 8d of February, 1850, which is also addressed to the same person as the preceding -letter. Among other things the writer states that he has every reason to believe that the documents mentioned by his correspondent would "be found in the City of Mexico, and as the claimant would return that way he had no doubt they would be procured. In another part of the same letter he also states that at present they think it may be the best plan “ to get an authenticated copy of the approval of the Mexican Government of the grant of three thousand varas given by the Alcalde on giving possession of the mine,” “as a doubt may be started whether the Alcalde, acting as the ‘ Jues de minería,' had a right to make this grant, yet if approved by the Government of Mexico, before the possession of the country by the Americans, there could be no doubt on- the subject.” * * * * * * *
Castillero says such approval was given, and that on his arrival in Mexico he will procure a judicial copy of it. This is Che plan we shall adopt if we hear nothing from you to alter this resolution. Writing from the mine, James A. Forbes, on the 26th day of February, 1850, replied to that letter, and the importance of that reply makes it necessary to give a somewhat extended extract from it as disclosing the intent and purpose of the entire series. Speaking of the claimant, he says:
- “ He succeeded in. obtaining the grant of two sitios to himself on the mining possession in Santa Clara, while that very act -.of possession declares that the mine is situated on the lands of one José E. Berreyesa, five leagues distant from Santa Clara, and *208 you will at once perceive that such a discrepancy woulc. not fail to attract the attention of United States Land Commissit tiers and to put the case of the mine in great risk in the judicial oí deal to which its title will be subjected.
' “Without troubling you with what I have so many times written and explained to you verbally, on the importance of the acquisition of the document, I will only say now what it must be, and it is this:
“■I. A full and complete ratification of all the acts, of the Alcalde of this jurisdiction in the possession- of the miné.
“2. A full and-qnconditional grant to Castillero of two sitios of land covering that mining possession, expressing the boundaries stated by me in the memorandum I left with you at Tepic. Both of these documents to be of the proper, date, and placed in the proper governmental custody in Mexico; and'— •
“ 3. The necéssary certified copies of them duly authenticated ’ by'the American Minister in that capital, taken and sent to me at the earliest-possible moment.”
Prompt reply was made by Barron, Forbes & Co., to that com munication, under date of the 2d of March, 1850, in which they say: “Mr. Barron and Don Andres Castillero, are about to proceed to the City of Mexico and will attend to what you have recommended. When that letter was written, the persons therein named were about to proceed to Mexico, but Alexander Forbes, nine days later, .wrote a letter to the same correspondent, in which he stated that Mr. 'Barron and Castillero have gone off to Mexico, and I wrote them to-day respecting the document you know of, which, if possible, will be procured.” Wishing, doubtless, to keep his correspondent well advised of the efforts being made to comply with his requisition for the title papers to the mine, he wrote him again on the 7th of April, 1850, in which he stated “that Mr. Barron and Castillero have arrived in Mexico, and have every prospect of finding the documents you are aware of and which will, of course, be forwarded as soon as possible.”
Counsel for claimant admit that every one of these letters are genuine, and the proofs in the case are full to that effect. Com Wts upon these extraordinary documents are unnecessary as *209 they disclose their own construction and- afford a demonstration that those in the possession of the mine, holding it under conveyances for the claimant, knew full well that he had no title.
X. More than that can hardly he required-in this case, but it is equally true, and satisfactory proofs are exhibited in the record to show it, that Mexico herself knew; must have known, that the pretensions of the claimant were unfounded, else she. never could have agreed to the 10th article of the treaty, or, when that was stricken out, never could have given her sanction to the corresponding explanations that were signed by the duly authorized representatives of both countries. Remarks^ however, upon that topic are unnecessary, and we forbear to pursue the subject.
The decree of the District Court in No. 133 is reversed, and, in the-.other the appeal is -dismissed, and the cause remande with directions to dismiss the entire petition.